NATIONAL SOCIETY OF PROFESSIONAL
ENGINEERS .v.˙ UNITED STATES

No. 76–1767.   Argued January 18, 1978—Decided April 25, 1978

680

STEVENS, J., delivered the opinion of the Court, in which STEWART, WHITE, MARSHALL, and POWELL, JJ., joined, and in Parts I and III of which BLACKMUN and REHNQUIST, JJ., joined. BLACKMUN, J., filed an opinion concurring in part and concurring in the judgment, in which REHNQUIST, J., joined, *post,* p. 699. BURGER, C. J., filed an opinion concurring in part and dissenting in part, *post,* p. 701. BRENNAN, J., took no part in the consideration or decision of the case.

*Lee Loevinger* argued the cause for petitioner. With him on the briefs was *Martin Michaelson.*

*Howard E. Shapiro* argued the cause for the United States.

With him on the brief were *Solicitor General McCree, Assistant Attorney General Shenefield,* and *Robert B. Nicholson.*

MR. JUSTICE STEVENS delivered the opinion of the Court.

This is a civil antitrust case brought by the United States to nullify an association's canon of ethics prohibiting competitive bidding by its members. The question is whether the canon may be justified under the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. § 1 *et seq.* (1976 ed.), because it was adopted by members of a learned profession for the purpose of minimizing the risk that competition would produce inferior engineering work endangering the public safety. The District Court rejected this justification without making any findings on the likelihood that competition would produce the dire consequences foreseen by the association.[1] The Court of Appeals affirmed.[2] We granted certiorari to decide whether the District Court should have considered the factual basis for the proffered justification before rejecting it. 434 U. S. 815. Because we are satisfied that the asserted defense rests on a fundamental misunderstanding of the Rule of Reason frequently applied in antitrust litigation, we affirm.

I

Engineering is an important and learned profession. There are over 750,000 graduate engineers in the United States, of whom about 325,000 are registered as professional engineers. Registration requirements vary from State to State, but usually require the applicant to be a graduate engineer with at least

---

[1] 389 F. Supp. 1193 (DC 1974).

[2] 181 U. S. App. D. C. 41, 555 F. 2d 978 (1977). When the District Court's original judgment was entered, petitioner was entitled to appeal directly to this Court. We vacated the District Court's judgment for reconsideration in the light of our then recent decision in *Goldfarb* v. *Virginia State Bar,* 421 U. S. 773. 422 U. S. 1031. After reconsideration, the District Court re-entered its original judgment, 404 F. Supp. 457 (DC 1975), and petitioner then appealed to the Court of Appeals.

four years of practical experience and to pass a written examination. About half of those who are registered engage in consulting engineering on a fee basis. They perform services in connection with the study, design, and construction of all types of improvements to real property—bridges, office buildings, airports, and factories are examples. Engineering fees, amounting to well over $2 billion each year, constitute about 5% of total construction costs. In any given facility, approximately 50% to 80% of the cost of construction is the direct result of work performed by an engineer concerning the systems and equipment to be incorporated in the structure.

The National Society of Professional Engineers (Society) was organized in 1935 to deal with the nontechnical aspects of engineering practice, including the promotion of the professional, social, and economic interests of its members. Its present membership of 69,000 resides throughout the United States and in some foreign countries. Approximately 12,000 members are consulting engineers who offer their services to governmental, industrial, and private clients. Some Society members are principals or chief executive officers of some of the largest engineering firms in the country.

The charges of a consulting engineer may be computed in different ways. He may charge the client a percentage of the cost of the project, may set his fee at his actual cost plus overhead plus a reasonable profit, may charge fixed rates per hour for different types of work, may perform an assignment for a specific sum, or he may combine one or more of these approaches. Suggested fee schedules for particular types of services in certain areas have been promulgated from time to time by various local societies. This case does not, however, involve any claim that the National Society has tried to fix specific fees, or even a specific method of calculating fees. It involves a charge that the members of the Society have unlawfully agreed to refuse to negotiate or even to discuss the question of fees until after a prospective client has selected the

engineer for a particular project. Evidence of this agreement is found in § 11 (c) of the Society's Code of Ethics, adopted in July 1964.[3]

The District Court found that the Society's Board of Ethical Review has uniformly interpreted the "ethical rules against competitive bidding for engineering services as prohibiting the submission of any form of price information to a prospective customer which would enable that customer to make a price comparison on engineering services."[4] If the client requires that such information be provided, then § 11 (c) imposes an

---

[3] That section, which remained in effect at the time of trial, provided: "Section 11—The Engineer will not compete unfairly with another engineer by attempting to obtain employment or advancement or professional engagements by competitive bidding . . . .

"c. He shall not solicit or submit engineering proposals on the basis of competitive bidding. Competitive bidding for professional engineering services is defined as the formal or informal submission, or receipt, of verbal or written estimates of cost or proposals in terms of dollars, man days of work required, percentage of construction cost, or any other measure of compensation whereby the prospective client may compare engineering services on a price basis prior to the time that one engineer, or one engineering organization, has been selected for negotiations. The disclosure of recommended fee schedules prepared by various engineering societies is not considered to constitute competitive bidding. An Engineer requested to submit a fee proposal or bid prior to the selection of an engineer or firm subject to the negotiation of a satisfactory contract, shall attempt to have the procedure changed to conform to ethical practices, but if not successful he shall withdraw from consideration for the proposed work. These principles shall be applied by the Engineer in obtaining the services of other professions." App. 9951.

[4] 389 F. Supp., at 1206. In addition to § 11 (c) of the Society's Code of Ethics, see n. 3, *supra*, the Society's Board of Directors has adopted various "Professional Policy" statements. Policy statement 10–F was issued to "make it clear beyond all doubt" that the Society opposed competitive bidding for all engineering projects. 389 F. Supp., at 1206. This policy statement was replaced in 1972 by Policy 10–G which permits price quotations for certain types of engineering work—in particular, research and development projects.

obligation upon the engineering firm to withdraw from consideration for that job. The Society's Code of Ethics thus "prohibits engineers from both soliciting and submitting such price information," 389 F. Supp. 1193, 1206 (DC 1974),[5] and seeks to preserve the profession's "traditional" method of selecting professional engineers. Under the traditional method, the client initially selects an engineer on the basis of background and reputation, not price.[6]

In 1972 the Government filed its complaint against the Society alleging that members had agreed to abide by canons of ethics prohibiting the submission of competitive bids for engineering services and that, in consequence, price competition among the members had been suppressed and customers had been deprived of the benefits of free and open competition. The complaint prayed for an injunction terminating the unlawful agreement.

In its answer the Society admitted the essential facts alleged by the Government and pleaded a series of affirmative defenses, only one of which remains in issue. In that defense, the Society averred that the standard set out in the Code of Ethics was reasonable because competition among professional engineers was contrary to the public interest. It was averred that it would be cheaper and easier for an engineer "to design and specify inefficient and unnecessarily expensive structures and

---

[5] Although the Society argues that it has never "enforced" its ban on competitive bidding, Reply Brief for Petitioner 15–18, the District Court specifically found that the record "support[s] a finding that NSPE and its members actively pursue a course of policing adherence to the competitive bid ban through direct and indirect communication with members and prospective clients." 389 F. Supp., at 1200. This finding has not been challenged as clearly erroneous.

[6] Having been selected, the engineer may then, in accordance with the Society's canons of ethics, negotiate a satisfactory fee arrangement with the client. If the negotiations are unsuccessful, then the client may withdraw his selection and approach a new engineer. *Id.*, at 1215.

methods of construction." [7]   Accordingly, competitive pressure to offer engineering services at the lowest possible price would adversely affect the quality of engineering.   Moreover, the practice of awarding engineering contracts to the lowest bidder, regardless of quality, would be dangerous to the public health, safety, and welfare.   For these reasons, the Society claimed that its Code of Ethics was not an "unreasonable restraint of interstate trade or commerce."

The parties compiled a voluminous discovery and trial record.   The District Court made detailed findings about the

---

[7] The entire defense pleaded in the answer reads as follows:

"18. (a) The principles and standards contained in the NSPE Code of Ethics, particularly those contained in that part of the NSPE Code of Ethics set out above, are reasonable, necessary to the public health, safety and welfare insofar as they are affected by the work of professional engineers, and serve the public interest.

"(b) Experience has demonstrated that competitive bidding for professional engineering services is inconsistent with securing for the recipients of such services the most economical projects or structures.   Testing, calculating and designing the most economical and efficient structures and methods of construction is complex, difficult and expensive.   It is cheaper and easier to design and specify inefficient and unnecessarily expensive structures and methods of construction.   Consequently, if professional engineers are required by competitive pressures to submit bids in order to obtain employment of their services, the inevitable tendency will be to offer professional engineering services at the lowest possible price.   Although this may result in some lowering of the cost of professional engineering services it will inevitably result in increasing the overall cost and decreasing the efficiency of those structures and projects which require professional engineering design and specification work.

"(c) Experience has also demonstrated that competitive bidding in most instances and situations results in an award of the work to be performed to the lowest bidder, regardless of other factors such as ability, experience, expertise, skill, capability, learning and the like, and that such awards in the case of professional engineers endanger the public health, welfare and safety.

"(d) For the aforesaid reasons, the provisions of the NSPE Code of Ethics set out above are not, in any event, in unreasonable restraint of interstate trade or commerce."   App. 21–22.

engineering profession, the Society, its members' participation in interstate commerce, the history of the ban on competitive bidding, and certain incidents in which the ban appears to have been violated or enforced. The District Court did not, however, make any finding on the question whether, or to what extent, competition had led to inferior engineering work which, in turn, had adversely affected the public health, safety, or welfare. That inquiry was considered unnecessary because the court was convinced that the ethical prohibition against competitive bidding was "on its face a tampering with the price structure of engineering fees in violation of § 1 of the Sherman Act." 389 F. Supp., at 1200.

Although it modified the injunction entered by the District Court,[8] the Court of Appeals affirmed its conclusion that the agreement was unlawful on its face and therefore "illegal without regard to claimed or possible benefits." 181 U. S. App. D. C. 41, 47, 555 F. 2d 978, 984.

## II

In *Goldfarb* v. *Virginia State Bar*, 421 U. S. 773, the Court held that a bar association's rule prescribing minimum fees for legal services violated § 1 of the Sherman Act. In that opinion the Court noted that certain practices by members of a learned profession might survive scrutiny under the Rule of Reason even though they would be viewed as a violation of the Sherman Act in another context. The Court said:

> "The fact that a restraint operates upon a profession as distinguished from a business is, of course, relevant in determining whether that particular restraint violates the

---

[8] The Court of Appeals struck down the portion of the District Court's decree that ordered the Society to state that it did not consider competitive bidding to be unethical. 181 U. S. App. D. C., at 47, 555 F. 2d, at 984. The court reasoned that this provision was "more intrusive than necessary to achieve fulfillment of the governmental interest." *Ibid.* The Government has not petitioned for review of that decision.

Sherman Act. It would be unrealistic to view the practice of professions as interchangeable with other business activities, and automatically to apply to the professions antitrust concepts which originated in other areas. The public service aspect, and other features of the professions may require that a particular practice, which could properly be viewed as a violation of the Sherman Act in another context, be treated differently. We intimate no view on any other situation than the one with which we are confronted today." 421 U. S., at 788–789, n. 17.

Relying heavily on this footnote, and on some of the major cases applying a Rule of Reason—principally *Mitchel* v. *Reynolds*, 1 P. Wms. 181, 24 Eng. Rep. 347 (1711); *Standard Oil Co.* v. *United States*, 221 U. S. 1; *Chicago Board of Trade* v. *United States*, 246 U. S. 231; and *Continental T. V., Inc.* v. *GTE Sylvania Inc.*, 433 U. S. 36—petitioner argues that its attempt to preserve the profession's traditional method of setting fees for engineering services is a reasonable method of forestalling the public harm which might be produced by unrestrained competitive bidding. To evaluate this argument it is necessary to identify the contours of the Rule of Reason and to discuss its application to the kind of justification asserted by petitioner.

*A. The Rule of Reason.*

One problem presented by the language of § 1 of the Sherman Act is that it cannot mean what it says. The statute says that "every" contract that restrains trade is unlawful.[9] But, as Mr. Justice Brandeis perceptively noted, restraint is the very

---

[9] Section 1 of the Sherman Act, as set forth in 15 U. S. C. § 1 (1976 ed.), provides:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. . . ."

essence of every contract; [10] read literally, § 1 would outlaw the entire body of private contract law. Yet it is that body of law that establishes the enforceability of commercial agreements and enables competitive markets—indeed, a competitive economy—to function effectively.

Congress, however, did not intend the text of the Sherman Act to delineate the full meaning of the statute or its application in concrete situations. The legislative history makes it perfectly clear that it expected the courts to give shape to the statute's broad mandate by drawing on common-law tradition.[11] The Rule of Reason, with its origins in common-law precedents long antedating the Sherman Act, has served that purpose. It has been used to give the Act both flexibility and definition, and its central principle of antitrust analysis has remained constant. Contrary to its name, the Rule does not open the field of antitrust inquiry to any argument in favor of a challenged restraint that may fall within the realm of reason. Instead, it focuses directly on the challenged restraint's impact on competitive conditions.

This principle is apparent in even the earliest of cases applying the Rule of Reason, *Mitchel* v. *Reynolds, supra. Mitchel* involved the enforceability of a promise by the seller of a bakery that he would not compete with the purchaser of his business. The covenant was for a limited time and applied only to the area in which the bakery had operated. It was therefore upheld as reasonable, even though it deprived the

---

[10] "But the legality of an agreement or regulation cannot be determined by so simple a test, as whether it restrains competition. Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence." *Chicago Board of Trade* v. *United States,* 246 U. S. 231, 238.

See also *United States* v. *Topco Associates,* 405 U. S. 596, 606:

"Were § 1 to be read in the narrowest possible way, any commercial contract could be deemed to violate it."

[11] See 21 Cong. Rec. 2456 (1890) (comments of Sen. Sherman); see generally H. Thorelli, Federal Antitrust Policy 228–229 (1955).

public of the benefit of potential competition. The long-run benefit of enhancing the marketability of the business itself—and thereby providing incentives to develop such an enterprise—outweighed the temporary and limited loss of competition.[12]

The Rule of Reason suggested by *Mitchel* v. *Reynolds* has been regarded as a standard for testing the enforceability of covenants in restraint of trade which are ancillary to a legitimate transaction, such as an employment contract or the sale of a going business. Judge (later Mr. Chief Justice) Taft so interpreted the Rule in his classic rejection of the argument that competitors may lawfully agree to sell their goods at the same price as long as the agreed-upon price is reasonable. *United States* v. *Addyston Pipe & Steel Co.*, 85 F. 271, 282–283 (CA6 1898), aff'd, 175 U. S. 211. That case, and subsequent decisions by this Court, unequivocally foreclose an interpretation of the Rule as permitting an inquiry into the reasonableness of the prices set by private agreement.[13]

The early cases also foreclose the argument that because of the special characteristics of a particular industry, monopolistic arrangements will better promote trade and commerce than competition. *United States* v. *Trans-Missouri Freight Assn.*, 166 U. S. 290; *United States* v. *Joint Traffic Assn.*, 171 U. S. 505, 573–577. That kind of argument is properly addressed to Congress and may justify an exemption from the statute for

---

[12] "4thly, The fourth reason is in favour of these contracts, and is, that there may happen instances wherein they may be useful and beneficial, as . . . in case of an old man, who finding himself under such circumstances either of body or mind, as that he is likely to be a loser by continuing his trade, in this case it will be better for him to part with it for a consideration, that by selling his custom, he may procure to himself a livelihood, which he might probably have lost, by trading longer." 1 P. Wms., at 191, 24 Eng. Rep., at 350.

[13] 85 F., at 293. See also *United States* v. *Trans-Missouri Freight Assn.*, 166 U. S. 290, 340–342.

specific industries,[14] but it is not permitted by the Rule of Reason. As the Court observed in *Standard Oil Co.* v. *United States,* 221 U. S., at 65, "restraints of trade within the purview of the statute . . . [can]not be taken out of that category by indulging in general reasoning as to the expediency or non-expediency of having made the contracts or the wisdom or want of wisdom of the statute which prohibited their being made."

The test prescribed in *Standard Oil* is whether the challenged contracts or acts "were unreasonably restrictive of competitive conditions." Unreasonableness under that test could be based either (1) on the nature or character of the contracts, or (2) on surrounding circumstances giving rise to the inference or presumption that they were intended to restrain trade and enhance prices.[15] Under either branch of the test, the inquiry is confined to a consideration of impact on competitive conditions.[16]

---

[14] Congress has exempted certain industries from the full reach of the Sherman Act. See, *e. g.,* 7 U. S. C. §§ 291–292 (1976 ed.) (Capper-Volstead Act, agricultural cooperatives); 15 U. S. C. §§ 1011–1013 (1976 ed.) (McCarran-Ferguson Act, insurance); 49 U. S. C. § 5b (Reed-Bulwinkle Act, rail and motor carrier rate-fixing bureaus); 15 U. S. C. § 1801 (1976 ed.) (newspaper joint operating agreements).

[15] "Without going into detail and but very briefly surveying the whole field, it may be with accuracy said that the dread of enhancement of prices and of other wrongs which it was thought would flow from the undue limitation on competitive conditions caused by contracts or other acts of individuals or corporations, led, as a matter of public policy, to the prohibition or treating as illegal all contracts or acts which were unreasonably restrictive of competitive conditions, either from the nature or character of the contract or act or where the surrounding circumstances were such as to justify the conclusion that they had not been entered into or performed with the legitimate purpose of reasonably forwarding personal interest and developing trade, but on the contrary were of such a character as to give rise to the inference or presumption that they had been entered into or done with the intent to do wrong to the general public and to limit the right of individuals, thus restraining the free flow of commerce and tending to bring about the evils, such as enhancement of prices, which were considered to be against public policy." 221 U. S., at 58.

[16] Throughout the Court's opinion the emphasis is on economic con-

In this respect the Rule of Reason has remained faithful to its origins. From Mr. Justice Brandeis' opinion for the Court in *Chicago Board of Trade* to the Court opinion written by MR. JUSTICE POWELL in *Continental T. V., Inc.*, the Court has adhered to the position that the inquiry mandated by the Rule of Reason is whether the challenged agreement is one that promotes competition or one that suppresses competition. "The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." 246 U. S., at 238, quoted in 433 U. S., at 49 n. 15.[17]

---

ceptions. For instance, the Court's description of the common-law treatment of engrossing and forestalling statutes noted that contracts which had been illegal on their face were later recognized as reasonable because they tended to promote competition. *Id.*, at 55. As was pointed out in the Report of the Attorney General's National Committee To Study the Antitrust Laws 11 (1955):

"While *Standard Oil* gave the courts discretion in interpreting the word 'every' in Section 1, such discretion is confined to consideration of whether in each case the conduct being reviewed under the Act constitutes an undue restraint of competitive conditions, or a monopolization, or an attempt to monopolize. This standard permits the courts to decide whether conduct is significantly and unreasonably anticompetitive in character or effect; it makes obsolete once prevalent arguments, such as, whether monopoly arrangements would be socially preferable to competition in a particular industry, because, for example, of high fixed costs or the risks of 'cutthroat' competition or other similar unusual conditions."

[17] In *Continental T. V., Inc.*, the Court explained the Rule of Reason standard as follows:

"Under this rule, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." 433 U. S., at 49.

The Court then analyzed the "market impact" of vertical restraints, noting their complexity because of the potential for a simultaneous reduction of intrabrand competition and stimulation of interbrand competition. *Id.*, at 50–51. "Competitive impact" and "economic analysis" were emphasized throughout the opinion.

There are, thus, two complementary categories of antitrust analysis. In the first category are agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality—they are "illegal *per se.*" In the second category are agreements whose competitive effect can only be evaluated by analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed. In either event, the purpose of the analysis is to form a judgment about the competitive significance of the restraint; it is not to decide whether a policy favoring competition is in the public interest, or in the interest of the members of an industry. Subject to exceptions defined by statute, that policy decision has been made by the Congress.[18]

*B. The Ban on Competitive Bidding.*

Price is the "central nervous system of the economy," *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 226 n. 59, and an agreement that "interfere[s] with the setting of price by free market forces" is illegal on its face. *United States* v. *Container Corp.,* 393 U. S. 333, 337. In this case we are presented with an agreement among competitors to refuse to discuss prices with potential customers until after negotiations have resulted in the initial selection of an engineer. While this is not price fixing as such, no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement. It operates as an absolute ban on competitive bidding, applying with equal force to both complicated and simple projects and to both inexperienced and sophisticated customers. As the District Court found, the ban "impedes the ordinary give and take of the market place," and substantially deprives the customer of "the ability to utilize

---

[18] See generally Attorney General's Report, *supra* n. 16, at 10–11; Bork, The Rule of Reason and the Per Se Concept: Price Fixing and Market Division, 74 Yale L. J. 775 (1965); L. Sullivan, Law of Antitrust 165–197 (1977).

and compare prices in selecting engineering services." 404 F. Supp. 457, 460. On its face, this agreement restrains trade within the meaning of § 1 of the Sherman Act.

The Society's affirmative defense confirms rather than refutes the anticompetitive purpose and effect of its agreement. The Society argues that the restraint is justified because bidding on engineering services is inherently imprecise, would lead to deceptively low bids, and would thereby tempt individual engineers to do inferior work with consequent risk to public safety and health.[19] The logic of this argument rests on the assumption that the agreement will tend to maintain the price level; if it had no such effect, it would not serve its intended purpose. The Society nonetheless invokes the Rule of Reason, arguing that its restraint on price competition ultimately inures to the public benefit by preventing the

---

[19] The Society also points out that competition, in the form of bargaining between the engineer and customer, is allowed under its canon of ethics once an engineer has been initially selected. See n. 6, *supra*. It then contends that its prohibition of competitive bidding regulates only the *timing* of competition, thus making this case analogous to *Chicago Board of Trade*, where the Court upheld an exchange rule which forbade exchange members from making purchases after the close of the day's session at any price other than the closing bid price. Indeed, petitioner has reprinted the Government's brief in that case to demonstrate that the Solicitor General regarded the exchange's rule as a form of price fixing. Reply Brief for Petitioner A1–A28. We find this reliance on *Chicago Board of Trade* misplaced for two reasons. First, petitioner's claim mistakenly treats negotiation between a single seller and a single buyer as the equivalent of competition between two or more potential sellers. Second, even if we were to accept the Society's equation of bargaining with price competition, our concern with *Chicago Board of Trade* is in its formulation of the proper test to be used in judging the legality of an agreement; that formulation unquestionably stresses impact on competition. Whatever one's view of the application of the Rule of Reason in that case, see Sullivan, *supra* n. 18, at 175–182, the Court considered the exchange's regulation of price information as having a positive effect on competition. 246 U. S., at 240–241. The District Court's findings preclude a similar conclusion concerning the effect of the Society's "regulation."

production of inferior work and by insuring ethical behavior. As the preceding discussion of the Rule of Reason reveals, this Court has never accepted such an argument.

It may be, as petitioner argues, that competition tends to force prices down and that an inexpensive item may be inferior to one that is more costly. There is some risk, therefore, that competition will cause some suppliers to market a defective product. Similarly, competitive bidding for engineering projects may be inherently imprecise and incapable of taking into account all the variables which will be involved in the actual performance of the project.[20] Based on these considerations, a purchaser might conclude that his interest in quality—which may embrace the safety of the end product—outweighs the advantages of achieving cost savings by pitting one competitor against another. Or an individual vendor might independently refrain from price negotiation until he has satisfied himself that he fully understands the scope of his customers' needs. These decisions might be reasonable; indeed, petitioner has provided ample documentation for that thesis. But these are not reasons that satisfy the Rule; nor are such individual decisions subject to antitrust attack.

The Sherman Act does not require competitive bidding;[21]

---

[20] We, of course, express no view on the truth of this assertion, although it might be noted that the Society has allowed competitive bidding for some types of engineering projects in this country, see n. 4, *supra,* and, at one time, allowed competitive bidding for all engineering work in foreign countries "as required by the laws, regulations or practices of the foreign country." App. 6487. This rule, called the "When-in-Rome" clause, was abolished in 1968. *Id.,* at 6344.

[21] Indeed, Congress has decided not to require competitive bidding for Government purchases of engineering services. The Brooks Act, 40 U. S. C. §§ 541–544 (1970 ed., Supp. V), requires the Government to use a method of selecting engineers similar to the Society's "traditional method." See n. 6, *supra.* The Society relies heavily on the Brooks Act as evidence that its ban on competitive bidding is reasonable. The argument is without merit. The Brooks Act does not even purport to exempt engineering services from the antitrust laws, and the reasonableness of an

it prohibits unreasonable restraints on competition. Petitioner's ban on competitive bidding prevents all customers from making price comparisons in the initial selection of an engineer, and imposes the Society's views of the costs and benefits of competition on the entire marketplace. It is this restraint that must be justified under the Rule of Reason, and petitioner's attempt to do so on the basis of the potential threat that competition poses to the public safety and the ethics of its profession is nothing less than a frontal assault on the basic policy of the Sherman Act.

The Sherman Act reflects a legislative judgment that ultimately competition will produce not only lower prices, but also better goods and services. "The heart of our national economic policy long has been faith in the value of competition." *Standard Oil Co.* v. *FTC,* 340 U. S. 231, 248. The assumption that competition is the best method of allocating resources in a free market recognizes that all elements of a bargain— quality, service, safety, and durability—and not just the immediate cost, are favorably affected by the free opportunity to select among alternative offers. Even assuming occasional exceptions to the presumed consequences of competition, the statutory policy precludes inquiry into the question whether competition is good or bad.

The fact that engineers are often involved in large-scale projects significantly affecting the public safety does not alter our analysis. Exceptions to the Sherman Act for potentially dangerous goods and services would be tantamount to a repeal of the statute. In our complex economy the number of items that may cause serious harm is almost endless—automobiles, drugs, foods, aircraft components, heavy equipment, and countless others, cause serious harm to individuals or to the public at large if defectively made. The judiciary cannot

individual purchaser's decision not to seek lower prices through competition does not authorize the vendors to conspire to impose that same decision on all other purchasers.

indirectly protect the public against this harm by conferring monopoly privileges on the manufacturers.

By the same token, the cautionary footnote in *Goldfarb,* 421 U. S., at 788–789, n. 17, quoted *supra,* cannot be read as fashioning a broad exemption under the Rule of Reason for learned professions. We adhere to the view expressed in *Goldfarb* that, by their nature, professional services may differ significantly from other business services, and, accordingly, the nature of the competition in such services may vary. Ethical norms may serve to regulate and promote this competition, and thus fall within the Rule of Reason.[22] But the Society's argument in this case is a far cry from such a position. We are faced with a contention that a total ban on competitive bidding is necessary because otherwise engineers will be tempted to submit deceptively low bids. Certainly, the problem of professional deception is a proper subject of an ethical canon. But, once again, the equation of competition with deception, like the similar equation with safety hazards, is simply too broad; we may assume that competition is not entirely conducive to ethical behavior, but that is not a reason, cognizable under the Sherman Act, for doing away with competition.

In sum, the Rule of Reason does not support a defense based on the assumption that competition itself is unreasonable. Such a view of the Rule would create the "sea of doubt" on which Judge Taft refused to embark in *Addyston,* 85 F., at 284, and which this Court has firmly avoided ever since.

### III

The judgment entered by the District Court, as modified by

---

[22] Courts have, for instance, upheld marketing restraints related to the safety of a product, provided that they have no anticompetitive effect and that they are reasonably ancillary to the seller's main purpose of protecting the public from harm or itself from product liability. See, *e. g., Tripoli Co.* v. *Wella Corp.,* 425 F. 2d 932 (CA3 1970) (en banc); cf. *Continental T. V.,* 433 U. S., at 55 n. 23.

the Court of Appeals,[23] prohibits the Society from adopting any official opinion, policy statement, or guideline stating or implying that competitive bidding is unethical.[24] Petitioner argues that this judgment abridges its First Amendment rights.[25] We find no merit in this contention.

Having found the Society guilty of a violation of the Sherman Act, the District Court was empowered to fashion appropriate restraints on the Society's future activities both to avoid a recurrence of the violation and to eliminate its consequences. See, *e. g., International Salt Co.* v. *United States,* 332 U. S. 392, 400–401; *United States* v. *Glaxo Group, Ltd.,* 410 U. S. 52, 64. While the resulting order may curtail the exercise of liberties that the Society might otherwise enjoy, that is a necessary and, in cases such as this, unavoidable consequence of the violation. Just as an injunction against price fixing abridges the freedom of businessmen to talk to one another about prices, so too the injunction in this case must restrict the Society's range of expression on the ethics of competitive bidding.[26] The First Amendment does not "make it . . . impossible ever to enforce laws against agreements in restraint of trade . . . ." *Giboney* v. *Empire Storage & Ice Co.,* 336 U. S. 490, 502. In fashioning a remedy, the District Court may, of course, consider the fact that its injunction may impinge upon rights that would otherwise be constitutionally

---

[23] See n. 8, *supra.*

[24] See App. 9974–9980.

[25] Petitioner contends the judgment is both an unconstitutional prior restraint on speech and an unconstitutional prohibition against free association.

[26] Thus, in *Goldfarb,* although the bar association believed that its fee schedule accurately reflected ethical price levels, it was nonetheless enjoined "from adopting, publishing, or distributing any future schedules of minimum or suggested fees." *Goldfarb* v. *Virginia State Bar,* 355 F. Supp. 491, 495–496 (ED Va. 1973). See also *United States* v. *National Assn. of Real Estate Boards,* 339 U. S. 485.

protected, but those protections do not prevent it from remedying the antitrust violations.

The standard against which the order must be judged is whether the relief represents a reasonable method of eliminating the consequences of the illegal conduct. We agree with the Court of Appeals that the injunction, as modified, meets this standard. While it goes beyond a simple proscription against the precise conduct previously pursued, that is entirely appropriate.

> "The District Court is not obliged to assume, contrary to common experience, that a violator of the antitrust laws will relinquish the fruits of his violation more completely than the court requires him to do. And advantages already in hand may be held by methods more subtle and informed, and more difficult to prove, than those which, in the first place, win a market. When the purpose to restrain trade appears from a clear violation of law, it is not necessary that all of the untraveled roads to that end be left open and that only the worn one be closed." *International Salt Co., supra,* at 400.

The Society apparently fears that the District Court's injunction, if broadly read, will block legitimate paths of expression on all ethical matters relating to bidding.[27] But the answer to these fears is, as the Court held in *International Salt,* that the burden is upon the proved transgressor "to bring any proper claims for relief to the court's attention." *Ibid.* In

---

[27] For instance, the Society argues that the injunction can be read as prohibiting it from opposing repeal of statutes such as the Brooks Act, see n. 21, *supra,* and that such a prohibition would violate the principles of the *Noerr-Pennington* doctrine. See *Eastern Railroad Presidents Conf.* v. *Noerr Motor Freight, Inc.,* 365 U. S. 127; *Mine Workers* v. *Pennington,* 381 U. S. 657. By its terms the injunction contains no such prohibition, and indeed the Government contends that "[n]othing in the judgment prevents NSPE and its members from attempting to influence governmental action . . . ." Brief for United States 60.

this case, the Court of Appeals specifically stated that "[i]f the Society wishes to adopt some other ethical guideline more closely confined to the legitimate objective of preventing deceptively low bids, it may move the district court for modification of the decree." 181 U. S. App. D. C., at 46, 555 F. 2d, at 983. This is, we believe, a proper approach, adequately protecting the Society's interests. We therefore reject petitioner's attack on the District Court's order.

The judgment of the Court of Appeals is

*Affirmed.*

MR. JUSTICE BRENNAN took no part in the consideration or decision of this case.

MR. JUSTICE BLACKMUN, with whom MR. JUSTICE REHNQUIST joins, concurring in part and concurring in the judgment.

I join Parts I and III of the Court's opinion and concur in the judgment. I do not join Part II because I would not, at least for the moment, reach as far as the Court appears to me to do in intimating, *ante*, at 696, and n. 22, that any ethical rule with an overall anticompetitive effect promulgated by a professional society is forbidden under the Sherman Act. In my view, the decision in *Goldfarb* v. *Virginia State Bar*, 421 U. S. 773, 788–789, n. 17 (1975), properly left to the Court some flexibility in considering how to apply traditional Sherman Act concepts to professions long consigned to self-regulation. Certainly, this case does not require us to decide whether the "Rule of Reason" as applied to the professions ever could take account of benefits other than increased competition. For even accepting petitioner's assertion that product quality is one such benefit, and that maintenance of the quality of engineering services requires that an engineer not bid before he has made full acquaintance with the scope of a client's desired project, Brief for Petitioner 49–50, 54, petitioner Society's rule is still grossly overbroad. As petitioner concedes, Tr. of Oral

Arg. 47–48, § 11 (c) forbids any simultaneous consultation between a client and several engineers, even where the client provides complete information to each about the scope and nature of the desired project before requesting price information. To secure a price estimate on a project, the client must purport to engage a single engineer, and so long as that engagement continues no other member of the Society is permitted to discuss the project with the client in order to provide comparative price information. Though § 11 (c) does not fix prices directly, and though the customer retains the option of rejecting a particular engineer's offer and beginning negotiations all over again with another engineer, the forced process of sequential search inevitably increases the cost of gathering price information, and hence will dampen price competition, without any calibrated role to play in preventing uninformed bids. Then, too, the Society's rule is overbroad in the aspect noted by Judge Leventhal, when it prevents any dissemination of competitive price information in regard to real property improvements prior to the engagement of a single engineer regardless of "the sophistication of the purchaser, the complexity of the project, or the procedures for evaluating price information." 181 U. S. App. D. C. 41, 45, 555 F. 2d 978, 982 (1977).

My skepticism about going further in this case by shaping the Rule of Reason to such a narrow last as does the majority,* arises from the fact that there may be ethical rules which have a more than *de minimis* anticompetitive effect and yet are important in a profession's proper ordering. A medical association's prescription of standards of minimum competence for licensing or certification may lessen the number of

---

*This Court has not always applied the Rule of Reason with such rigor even to commercial businesses. See *Appalachian Coals, Inc.* v. *United States,* 288 U. S. 344 (1933); *Chicago Board of Trade* v. *United States,* 246 U. S. 231 (1918); L. Sullivan, Law of Antitrust 175–182 (1977); R. Bork, The Antitrust Paradox 41–47, 56 (1978). I intimate no view as to the correctness of those decisions.

entrants. A bar association's regulation of the permissible forms of price advertising for nonroutine legal services or limitation of in-person solicitation, see *Bates* v. *State Bar of Arizona,* 433 U. S. 350 (1977), may also have the effect of reducing price competition. In acknowledging that "professional services may differ significantly from other business services" and that the "nature of the competition in such services may vary," *ante,* at 696, but then holding that ethical norms can pass muster under the Rule of Reason only if they promote competition, I am not at all certain that the Court leaves enough elbowroom for realistic application of the Sherman Act to professional services.

MR. CHIEF JUSTICE BURGER, concurring in part and dissenting in part.

I concur in the Court's judgment to the extent it sustains the finding of a violation of the Sherman Act but dissent from that portion of the judgment prohibiting petitioner from stating in its published standards of ethics the view that competitive bidding is unethical. The First Amendment guarantees the right to express such a position and that right cannot be impaired under the cloak of remedial judicial action.