**UNITED STATES of America, Plaintiff,**

v.

**KERASOTES ILLINOIS THEATRES, INC., Kerasotes Enterprises, d/b/a Kerasotes Administration Company, and Dan L. Owen, Defendants.**

No. 86–30032.

United States District Court,
C.D. Illinois,
Springfield Division.

Jan. 9, 1987.

964

Morris O. Pasqual, Mary E. Jones and James Gross, Attys., Antitrust Div., U.S. Dept. of Justice, Chicago, Ill., for plaintiff.

Joseph Giffin and Mary Gilhooly, Chicago, Ill., James R. Potter and Charles J. Gramlich, Springfield, Ill., for defendants.

## JUDGMENT ORDER

MILLS, District Judge:

A *criminal* antitrust prosecution.

The jury returned a verdict of not guilty as to each Defendant.

The Court agrees—in aces, spades, and trumps!

Judgment is hereby entered in favor of the Defendants and against the Government on that verdict.

On May 8, 1985, a federal grand jury sitting in Springfield, Illinois, returned a one-count indictment charging Kerasotes-Illinois Theatres, Inc., Kerasotes Enterprises (collectively called "Kerasotes"), and Dan Owen with having engaged in a conspiracy in restraint of trade in violation of section 1 of the Sherman Act, 15 U.S.C. § 1. The specific business practices that allegedly violated the Sherman Act in this case are called "split agreements" which, until recently, were a common phenomena in the motion picture industry.

As defined by the Justice Department, a split agreement, also known as a "split-of-product," is an arrangement by which motion picture exhibitors in a particular market allocate among themselves the right to negotiate or bid for films offered by distributors for exhibition in that locale. Exhibitors also agree that they will refrain, either completely or for a stated period, from negotiating or bidding against each other for the right to exhibit films so allocated. Occasionally, film distributors are parties to the split agreements, but in many instances they involve only exhibitors.

This case involved motion picture splitting in Quincy, a small city in West Central Illinois on the Mississippi River with a population of approximately 42,000. There are two theatre chains in Quincy: Kerasotes, the larger of the two, operates three theatres with a total of 7 screens. The other, Dickenson, operates one theatre with 3 screens.

As was their practice for numerous years, every few months employees of Kerasotes and Dickenson talked on the phone to allocate which films each of them would purchase from the film distributors. In the telephone conferences, Kerasotes and Dickenson would take turns choosing a first-run film, with the exhibitor that chose second the previous time choosing first.

The distributors were well aware of—and even encouraged—this practice. For instance, when a movie was about to be released, distributors would often call and ask one of these Quincy exhibitors if it had split yet. In addition, both Kerasotes and Dickenson attempted to accommodate the distributors in their selection of movies by playing first run movies as they were scheduled for release by the producers and distributors. These arrangements worked well, as is demonstrated by their prevalance across the nation. There was ample testimony in this case that everyone—film producers, distributors, exhibitors and viewing public—benefited by the split agreements. In fact, when splits between exhibitors ceased, the distributors merely took over the job of allocating the films to the exhibitors, receiving whatever prices they charged or negotiated, as before.

At trial, Defendants contended that during the time periods covered by the indictment (December 1983—July 1985), the legality of splits was unsettled. Here is the unchallenged chronology of the pertinent background:

I. For forty years prior to 1977, the Justice Department took the position that split agreements among film exhibi-

tors were "legal if the film allocation was accomplished with distributor participation or consent." (Justice Dept. announcement of April 1, 1977).

II. Prior to 1977, federal courts held that splits were to be judged under the "rule of reason" analysis and found them lawful when the distributor consented. *See, e.g., United States v. Lowe's, Inc.,* 1962 CCH Trade Cases ¶ 70, 347 at p. 76,374 (S.D.N.Y.1962); *Dahl, Inc. v. Roy Cooper Co.,* 448 F.2d 17, 19 (9th Cir. 1971). Under these guidelines, motion picture splitting flourished and remained a widespread practice among exhibitors.

III. Then, in April of 1977, the Justice Department issued a press release [1] stating that it regarded any form of split agreement to be unlawful under section 1.

IV. However, in response to protest by the motion picture industry, the Antitrust Division agreed that the courts should decide the legality of splits and stated that its enforcement actions would be *civil* until the legality of splits was decided by the courts.

V. Shortly after the press release, several exhibitors in Virginia brought an action against the Attorney General for a declaratory judgment that splits were not *per se* offenses under section 1. That suit resulted in a decision in the exhibitors' favor. There, the district court held that splits were *not per se* offenses under section 1. *Greenbriar Cinemas, Inc. v. Attorney General,* 511 F.Supp. 1046 (W.D.Va.1981). *The Government took no appeal* from this decision in order to obtain a ruling by a

---

1. The text of that press release is as follows:

On April 1, 1977, Attorney General Griffin B. Bell announced that the Department of Justice was of the belief that the use of "split" agreements by motion picture exhibitors violated the antitrust laws and that continuation of this practice would subject participants to appropriate legal action by the Department's Antitrust Division.

A split agreement, also known as a "split-of-product," is an arrangement by which motion picture exhibitors in a particular market allocate among themselves the right to negotiate or bid for films offered by distributors for exhibition in that locale. The exhibitors also agree that they will refrain, either completely or for a stated period, from negotiating or bidding against each other for the right to exhibit films so allocated. Occasionally, film distributors are parties to the split agreements, but in many instances they involve only exhibitors.

Split agreements have been widely used by motion picture exhibitors for decades. However, their use became especially prevalent after the Supreme Court's 1948 opinion in *United States v. Paramount Pictures, Inc.,* a decision that resulted in extensive structural changes in the motion picture exhibition industry.

Donald I. Baker, Assistant Attorney General in charge of the Antitrust Division, said split agreements are virtually indistinguishable from bid-rigging practices, a traditional *per se* violation of Section 1 of the Sherman Act. In addition, Mr. Baker said, there are no special circumstances in the motion picture exhibition industry that would justify the use of such anticompetitive agreements.

Mr. Baker explained that, despite its opinion as to the legality of split arrangements, the Department did not propose to proceed with a lawsuit against the practice. Instead, the Department issued notice of its conclusion to permit the industry to adjust its long-standing reliance on split agreements and to advise that continuance of the practice would subject exhibitors and other participants to prosecution.

Mr. Baker said this notification was warranted because prior statements by Antitrust Division personnel may have contributed to uncertainty in the industry as to the legality of these agreements. Because of this, it seemed more appropriate to inform the industry of the Department's present enforcement intention prior to filing a suit challenging the practice, he said.

Mr. Baker further explained that, while the Antitrust Division had never sanctioned split agreements involving only exhibitors, its officials had taken the position that a split agreement was legal if the film allocation was accomplished with distributor participation or consent. This interpretation was made by Division officials in the course of Congressional hearings, court proceedings and other communications with the industry over the past 25 years.

The Attorney General directed Mr. Baker and his staff to investigate any split arrangements that continue or are commenced after April 1, 1977. See ¶ 1645

April 1, 1977, press release of Department of Justice, as reported in [Transfer Binder Current Comments], Trade Reg. Rep. (CCH) ¶ 50,313.

higher court, and the results of this litigation were published in the motion picture trade press.

VI. In 1980, the Government instituted a *civil* action of its own against exhibitors in Milwaukee, Wisconsin, alleging that a split agreement among exhibitors in that city violated section 1. The case was tried as both a rule of reason case and a *per se* case and in June 1983, the district court held the Milwaukee split *per se* unlawful. *United States v. Capitol Services, Inc.,* 568 F.Supp. 134 (E.D. Wis.1983).

VII. While the *Capitol Service* case was pending in the district court or on appeal to the Seventh Circuit, two district courts in California and the Court of Appeals for the Fifth Circuit rendered conflicting decisions on split agreements. In September 1983, Judge Rafeedie held in a civil case that the split agreements there involved *were not per se* offenses and were to be judged by the rule of reason. *Exhibitor's Service, Inc. v. American Multi-Cinema, Inc.* (unpublished opinion). *See* 788 F.2d 574, 578 n. 5, 1986–1 CCH Trade Cases, p. 62,497 n. 5 (9th Cir.1986). On the other hand, Judge Kenyon of the same district, also in a civil case, held in 1982 that the split agreements there involved were *per se* unlawful because, in that judge's opinion, they were equivalent to price fixing. *General Cinema Corp. v. Buena Vista Dist. Co.,* 532 F.Supp. 1244, 1279 (C.D. Cal.1982). Further, the Fifth Circuit, in *Southway Theatres, Inc. v. Georgia Theatre Co.,* 672 F.2d 485, 492 (5th Cir.1982) noted in dicta that "split agreement[s] among the circuit theatres do *not* constitute an independent violation of the antitrust laws" and would be improper only if some exhibitors combined with distributors to foreclose other exhibitors from the market.

VIII. Finally, on February 28, 1985, the Seventh Circuit in *United States v. Capitol Services, Inc.,* 756 F.2d 502 (7th Cir.1985), affirmed the scope of injunctive relief granted by the Milwaukee district court, holding that the nationwide scope of injunctive relief was proper in that case. Since the defendants challenged only the nation-wide scope of the district court's injunction, the legality of split agreements in general was not strictly at issue on appeal. Nevertheless, the court of appeals' opinion contained a statement that splits were a form of agreement not to bid and therefore subject to the *per se* rule of *National Society of Professional Engineers v. United States,* 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). The Seventh Circuit denied rehearing in *Capitol Services* on April 22, 1985, and the Supreme Court denied certiorari on November 4, 1985. —— U.S. ——, 106 S.Ct. 311, 88 L.Ed.2d 288 (1985).

The foregoing sequence of events demonstrates that the legality of splits was completely unsettled during a substantial portion of the period covered by the instant indictment—December 1983 to April 1985, all but 3 months out of the 20 months charged—and the issue as yet remains unresolved by the Supreme Court. Further, all the recent decisions were in *civil* cases. During this period, no criminal indictment had been returned involving splits. The indictment in this case is the first in the country ever to charge that split agreements are a violation of the *criminal* law under the federal antitrust statute.

It is a fundamental tenet of our criminal jurisprudence that conviction of a crime requires proof of intent beyond a reasonable doubt. But in a criminal antitrust case, two different types of intent are generally required: "the basic intent to agree, which is necessary to establish the existence of the conspiracy, and the more traditional intent to effectuate the object of the conspiracy." *United States v. U.S. Gypsum Co.,* 438 U.S. 422, 443 n. 20, 98 S.Ct. 2864, 2877 n. 20, 57 L.Ed.2d 854 (1978). With respect to the second type—the intent to effectuate the object of the conspiracy— the Supreme Court has held that this element is satisfied by proof that either: (1) the Defendant's conduct was "undertaken with knowledge of its probable conse-

quences *and* [actually had] the requisite anticompetitive effects"; or (2) Defendant's conduct was undertaken "with the purpose of producing anticompetitive effects ... even if such effects did not come to pass." *Id.* at 444 and n. 21, 98 S.Ct. at 2877 and n. 21.

As already noted, during the time periods alleged in this indictment the courts were uncertain as to whether the probable consequence of motion picture splitting was an anticompetitive effect. Clearly, therefore, the jury's finding that these Defendants lacked the intent to produce anticompetitive effects is supported by the evidence. We note that our circuit "does not read *Gypsum* as indicating that once Defendants are proved to have intentionally made an agreement which is unlawful *per se*, there must be an instruction that the Defendants cannot be convicted unless they are found to have intended to restrain trade or commerce." *United States v. Brighton Bldg. & Maintenance Co.*, 598 F.2d 1101, 1106 (7th Cir.1979). However, as explained above, these Defendants were not even aware that their conduct could be labeled unlawful *per se* in a *civil* case. Thus, it is incredible to believe that they could have been charged with knowledge that their actions would have an anticompetitive effect, and that they would be subject to *criminal* liability.

It should be flagged that the sole effect of this prosecution has been to change who does the splitting. Instead of the exhibitors, distributors now dictate which film shall be offered for exhibition. Because the process for allocating movies remains intact, it is doubtful at best that the exhibitor splitting in fact had any anticompetitive effect.

It is against this backdrop that the jury returned its verdict of not guilty. The verdict is overwhelmingly supported by the evidence, and is a just finish to this prosecution.

The Court therefore enters judgment upon the jury verdict of not guilty. De-

fendants are released from their respective bonds.

Case CLOSED.