MASSACHUSETTS SCHOOL OF
LAW AT ANDOVER, INC.

v.

AMERICAN BAR ASSOCIATION, et al.

Civ. A. No. 93CV6206.

United States District Court,
E.D. Pennsylvania.

May 20, 1994.

Harold E. Kohn, Joanne Zack of Kohn, Nast & Graf, P.C., Philadelphia, PA, Lawrence R. Velvel, Michael L. Coyne, Peter M. Malaguti, Constance L. Rudnick, Andover, MA, for plaintiff.

Barbara W. Mather, L. Suzanne Forbis, of Pepper, Hamilton & Scheetz, Philadelphia, PA, H. Blair White, David T. Pritikin, William H. Baumgartner, Jr. of Sidley & Austin, Chicago, IL, for defendant.

## *MEMORANDUM AND ORDER*

DITTER, District Judge.

This case, which involves law school accreditation and alleged violations of the federal antitrust laws, comes before the court on a motion to compel discovery. Plaintiff asserts in its complaint that the American Bar Association ("ABA") monopolizes the accreditation process. Defendants, plaintiff asserts, have conspired to restrain trade by imposing anticompetitive accreditation standards on law schools seeking to become and remain accredited. A multitude of motions have been filed, including plaintiff's motion to compel the production of documents. This memorandum will address the scope of permitted discovery so that it can be focused on the issues that are initially critical in this case.

### I. FACTS

Plaintiff, Massachusetts School of Law at Andover, Inc. ("MSL") is a non-profit corporation that operates a law school in Andover, Massachusetts. The law school opened its doors in 1988 and sought accreditation from the ABA. In 1993 the ABA denied MSL's application for accreditation. MSL subsequently filed this lawsuit against four organizational defendants and 22 individual defendants. MSL maintains that six of the ABA's accreditation standards are anticompetitive and that the ABA has abused its monopoly power over accreditation.[1] This monopoly power follows from the fact, according to the plaintiff, that 41 of the 50 states rely upon the ABA to determine which law schools

---

1. For a more detailed recitation of the allegations in MSL's complaint, see my memorandum of March 11, 1994, pp. 2–3 846 F.Supp. 374.

shall be deemed to provide appropriate legal education.

In two counts, MSL claims that defendants have combined and conspired to organize and enforce a group boycott in restraint of trade, a violation of the Sherman Act, Section 1; and that defendants have conspired to monopolize the provision of law school training, the accreditation of law schools, and the licensing of lawyers, in violation of the Sherman Act, Section 2. 15 U.S.C. §§ 1, 2.

I met with counsel to discuss the preliminary issues in this case and told them to submit a joint proposal or, if that was impossible, separate proposals addressing the rule of reason and the allegation of concerted action. My purpose in telling the parties to respond to specific questions was to have them move beyond the all-encompassing allegations of the complaint and to come to grips with the legal issues that need to be determined initially. The parties have addressed the specific questions superficially, focusing on accreditation as a whole and not on the particular criteria which MSL alleges are anticompetitive. Further, plaintiff has submitted extensive exhibits that often do not support the point stated in its response, and in some cases contradict that point. Defendant, on the other hand, has gone beyond the questions raised at the conference and argued several defenses to the claim. Meanwhile, ten motions, responses, replies, surreplies, and supplements have been filed regarding discovery and confidentiality. It is my intention that this memorandum and order will set the parties to the immediate task at hand, call them away from the allure of abusive inquisition, and free third parties from the burdens of discovery that may never be required.

## II. THE CHALLENGED CRITERIA

Plaintiff states that it is not challenging the desirability of accreditation in general.[2] Rather, claiming that they increase salaries, costs and tuitions; reduce work and output; and therefore are restraints of trade, MSL challenges six accreditation criteria that en-

compass several of the more than 50 ABA standards: salary levels (ABA Standard 405); student-faculty ratios, limits on teaching hours and sabbatical requirement (ABA Standards 201 and 401–405); use of the Law School Admission Test or other test (ABA Standard 503); guidelines for law libraries (ABA Standards 602, 603, and 704); prohibition of for-credit bar review courses (ABA Standard 302(b)); and limits on hours that students may be employed (ABA Standard 305).[3] Finally, MSL asserts that defendants boycott unaccredited law schools by excluding them from recruiting conferences and materials for prospective applicants, by not allowing tuition loans to be used at unaccredited schools, and by precluding accredited schools and graduate programs from accepting credits from transfer applicants of unaccredited schools.

The first question I must address is under what category the challenged standards will be analyzed.

## III. THE RULE OF REASON

As the Supreme Court has long held, there are two complimentary categories of antitrust analysis. The first category, *per se* violations, includes agreements whose nature and effect are so obviously anticompetitive on their face that no detailed exploration is required to establish their illegality. *National Soc'y of Prof'l Eng'rs v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978). The second category involves agreements whose competitive effect can be measured by studying the facts peculiar to the activity in question, the history of the restraint, and why it was imposed. *Id.* The purpose of the inquiry is to assess the competitive significance of the restraint. Restraints in the second category are thus analyzed under the rule of reason, which essentially seeks to discover if the challenged restraint is one that promotes competition or suppresses competition. *Id.* at 691, 98 S.Ct. at 1365.

2. It then proceeds to do so.

3. In some instances, plaintiff has taken an ABA standard, molded it to make it a more suitable target, and then let fly with hyperbolic broad-

sides. Addressing the standard as written and interpreted might be a more helpful tactic in the future.

840

The Supreme Court has been hesitant to denounce as unreasonable *per se* the rules adopted by professional associations. *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 458, 106 S.Ct. 2009, 2017, 90 L.Ed.2d 445 (1986); *see also National Soc'y of Prof'l Eng'rs*, 435 U.S. at 696, 98 S.Ct. at 1367 ("we adhere to the view that professional services may differ significantly from other business services and, accordingly, the nature of the competition in such services may vary."); *Weiss v. York Hosp.*, 745 F.2d 786, 821 n. 60 (3d Cir.1984) (where "ethical norm" of a learned profession is under attack on Sherman Act § 1 grounds, the rule of reason analysis governs), *cert. denied*, 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985). The accreditation criteria of which plaintiff complains are educational standards adopted by the ABA, a professional association. Therefore, while they are not rules of professional conduct or ethical norms for the practice of law, the same policy reasons suggest that the ABA criteria should not be condemned out of hand.

■ The accreditation criteria in question are simply not, as plaintiff avers, *per se* unlawful. For example, plaintiff asserts that ABA Standard 405(a), relating to faculty salary, is price fixing, a *per se* violation of § 1. It is not. The standard states that "compensation paid faculty members at a school seeking approval should be comparable with that paid faculty members at similar approved law schools in the same general geographical area." *Standards for Approval of Law Schools and Interpretations*, October 1993 (Standard 405(a)). This can hardly be viewed as fixing the salary of any or all law school professors when no dollar amount is given, no minimum floor is set, and the standard does not purport to define an acceptable salary range. The standard deals with averages and the range is vague. "Comparable,"

"similar," "general," and "area" are about as indefinite as words can be.[4] Obviously faculty salaries are merely one of an infinite series of factors that go to determine tuition costs, which themselves may vary at the same institution for a variety of reasons.[5] Simply put, while Standard 405(a) may be price-affecting, it can hardly be characterized as price-fixing.

■ Similarly, although MSL says that exclusion from certain recruitment conferences or application information is a boycott of unaccredited schools, merely naming the practice a "boycott"—and thus calling it a *per se* unlawful restraint—does not make it so.[6] Therefore, I find that the rule of reason applies to the alleged restraints in this case.

■ Finding that the rule of reason analysis is proper for this case does not, of course, explain how the analysis is to be accomplished. The goal of the inquiry is to determine if the restraint "merely regulates and perhaps thereby promotes competition or whether it may suppress or even destroy competition." *Continental T.V., Inc. v. GTE Sylvania*, 433 U.S. 36, 49 n. 15, 97 S.Ct. 2549, 2557 n. 15, 53 L.Ed.2d 568 (1977) (citation omitted). The inquiry can be addressed in three parts. First, what is the harm to competition that results from the particular restraint? Second, does the standard have "redeeming virtues" or a socially useful purpose? Third, are there less restrictive ways to achieve these redeeming virtues?

## IV. DISCOVERY

It is not enough to say, however often and stridently, that the accreditation standards under attack are anticompetitive. Obviously, *any* criterion serves to restrict competition among law schools if it operates to prevent every corner grocery and gas station from

---

4. In addition, Standard 104(a) permits accreditation to a school that "substantially" complies, provided the school reasonably assures the ABA that it will fully comply within three years. Finally, Standard 802 permits a school to apply for a variance from one or more standards.

5. Some state-supported law schools, for example, have different tuitions for students from the state and students from out of state. In addition,

tuition may vary based on whether the student is in his or her first, second, or third year.

6. A true *per se* unlawful boycott would occur, for example, if all the accredited law schools in the country agreed that they would refuse to purchase law books from the West Publishing Company unless West stopped selling to unaccredited schools. No such allegations have even be hinted at.

also operating a law school. Section 1 of the Sherman Act prohibits only unreasonable restraints on trade. MSL says it does not make the broad claim that all accreditation standards are illegal, but only that some are. Each of the challenged criteria, therefore, must initially be treated as a separate area of inquiry. Discovery should focus on answering the three questions posed by the rule of reason so that the court can assess whether the challenged accreditation standards are, individually or in the aggregate, unreasonable restraints on competition. If they are not, the case is over and there is no need to build from keel to crow's nest the discovery dreadnought on which plaintiff seeks to embark.

### A. Plaintiff's Request for Documents

██ Plaintiff has requested documents pertaining to the accreditation of all 177 ABA-accredited law schools. MSL later modified its request to 75 law schools. These documents are not needed to answer the three questions contemplated by a rule of reason analysis. If the criteria are unreasonable restraints on competition, it is scarcely relevant that the restraints may have been applied in some cases but not in others. The rule of reason seeks to answer whether the restraints are unreasonable, not whether they have been uniformly exercised.[7]

### B. Discoverable Documents and Areas of Inquiry

So that a rule of reason analysis may be made, the parties should focus on matters that will show whether the ABA standards have imposed a restraint on competition— and if so, on whom. This may require a consideration of conditions before a particular standard was adopted and conditions since then, and of course, the question of causation.

██ When it comes to redeeming virtues and less restrictive alternatives, suggestions, discussions, statistics, studies, reports, and the professional judgments that formed the basis for one or more of the standards may be relevant. In the same vein is the language that has been suggested, discussed, and accepted or rejected and for what reasons. Statistics and compilations of data concerning salaries, numbers of law school applicants, graduates, and professorial applicants are a legitimate area of inquiry, although I see no reason why individual salaries or individual law schools need to be identified, at least not for rule of reason purposes. The information may be gleaned from the ABA's general records, discussions, and adoption of the challenged criteria, as well as from the LSAS/LSAC's materials about the creation and use of the LSAT. The AALS likely has information about recruiting conferences by accredited schools, admission of transfer and post-graduate students, and collective admissions materials. All of these sorts of documents are discoverable, as are depositions of accreditation experts and consultants. What is not discoverable at this time, however, are the accreditation files maintained on each law school that has sought ABA accreditation or information from any particular law school, except the plaintiff itself.

In addition, plaintiff's own standards and practices would seem to be a legitimate area of inquiry. How do MSL's practices mirror or depart from the ABA criteria and why? Are they less restrictive ways of achieving the redeeming virtues claimed by the ABA? Plaintiff's internal discussions, consultations, judgments, reasoning, and logic will no doubt be important to the rule of reason analysis, particularly in assessing the viability of less restrictive alternatives to the challenged standards.

### C. Specifics of the Rule of Reason Inquiry

It is not my purpose to limit discovery within the framework of the rule of reason, but rather to eliminate, for the time being, any other discovery. Without intending to restrict the parties to only these questions, discovery should focus on the following areas of inquiry for each standard:

---

7. It would be a curious argument, indeed, and one I have not seen made in any other case, that defendants not only restrained competition unreasonably, but did so haphazardly.

I. Does this standard have an anticompetitive effect?

   A. On whom does it have an anticompetitive effect,

     -American society in general?

     -all law schools or some law schools?

     -all law professors or some law professors?

     -all librarians or some librarians?

     -all deans or some deans?

     -all students or some students?

     -all state governments or some state governments?

     -all courts or some courts?

     -all clients or some clients?

     -anyone else, and if so, on whom?

   B. Identify insofar as possible those to whom reference is made in ¶ I A.

   C. To what extent is it possible to prove by empirical data that this standard causes actual restraint on competition by or among any of the entities/persons referred to in ¶ I A.? What are those data?

   D. To what extent is it possible to prove by other evidence that this standard causes actual restraint on competition by or among any of the entities referred to in ¶ I A.? What is that evidence?

   E. Is the effect of this standard, as to each of the persons referred to in ¶ I A, merely to regulate competition among them—and thus encourage it—or does it suppress or even destroy competition among them?

   F. Before this standard was adopted, what were the facts that show the nature of competition with which it is or was concerned?

   G. What are the present facts concerning the nature of the competition with which this standard is or was concerned?

   H. To what degree is this standard the cause of a change in those facts?

II. What redeeming virtues are claimed for this standard?

   A. For whom are these redeeming virtues claimed?

     -American society in general?

     -all law schools or some law schools?

     -all law professors or some law professors?

     -all librarians or some librarians?

     -all deans or some deans?

     -all students or some students?

     -all state governments or some state governments?

     -all courts or some courts?

     -all clients or some clients?

     -as to anyone else, and if so, as to whom?

   B. Identify insofar as possible those to whom reference is made in ¶ II A.

   C. To what extent is it possible to prove by empirical data as to any of them that this standard helps to achieve any of the redeeming virtues claimed for it?

     1. What evil was this standard intended to correct?

     2. How was this standard intended to correct that evil?

     3. What changes have occurred since this standard was adopted?

     4. To what extent is it possible to prove that this standard has corrected the evil referred to ¶ C.1.?

     5. Rather than correcting the evil referred to in ¶ C.1., did those who adopted this standard have some other intent, and if so, what was it?

   D. What other evidence can be presented to show that this standard helps to achieve any of the redeeming virtues claimed for it?

   E. Are there any statutes that suggest that this standard has or does not have redeeming virtues?

III. Is there a way to achieve the redeeming virtues claimed for this standard that would be less restrictive of competition?

   A. Would these less restrictive ways accomplish the redeeming virtues as to

     -American society in general?

     -all law schools or some law schools?

     -all law professors or some law professors?

     -all deans or some deans?

     -all librarians or some librarians?

     -all students or some students?

     -all state governments or some state governments?

-all courts or some courts?

-all clients or some clients?

-anyone else, and if so, as to whom?

B. Identify insofar as possible those to whom reference is made in ¶ III A.

C. To what extent is it possible to prove by empirical data that the redeeming virtues claimed for this standard can be accomplished by a means that would be less restrictive of competition? What are those data?

D. What other evidence can be presented which will show that the redeeming virtues claimed for this standard can be accomplished by a means that would be less restrictive of competition? What is that evidence?

E. Are the alternative ways of achieving the redeeming virtues realistically and practically possible?

## ORDER

AND NOW, this 20th day of May, 1994, it is hereby ordered that:

1. Plaintiff's motion to compel discovery is DENIED.

2. Discovery shall address solely the rule of reason analysis.

3. Until further order of court, discovery shall proceed only with the documents and records discussed following heading IV B. on pages 8 through 10 of the attached memorandum, and on the questions and considerations specified in the outline following heading IV C. on pages 10 through 12.

4. All discovery requested or begun prior to the date of this order shall cease to the extent that it does not conform to ¶ 3 above.

5. All parties on whom discovery requests have been or will be made shall be informed of this order.

6. All discovery on the rule of reason analysis shall be concluded by September 1, 1994.

7. On or before September 1, 1994, the parties shall submit to me their joint proposal as to how they wish the court to resolve any outstanding issues of fact that will be required in making a rule of reason analysis.

8. Pre-trial conferences will be held on June 6, 1994, at 10:00 a.m.; July 11, 1994, at 9:30 a.m.; and August 8, 1994, at 9:30 a.m., to discuss the status of discovery.

9. Counsel are directed to use a Bates numbering machine to identify documents for discovery purposes. So far as documents that will be introduced into evidence are concerned, plaintiff will use an initial series of numbers (i.e., 001 to 999) and defendants, later series of numbers (for example, 1000 to 1999 for the ABA, 2000 to 2999 for the AALS, and 3000 to 3999 for the LSAS/LSAC).