**WARNER AMEX CABLE COMMUNICATIONS, INC., Plaintiff,**

v.

**AMERICAN BROADCASTING COMPANIES, INC., ABC Sports, Inc., and National Collegiate Athletic Association, Defendants.**

**No. C–2–80–558.**

United States District Court, S. D. Ohio, E. D.

Aug. 20, 1980.

Alexander, Ebinger, Fisher, McAlister & Lawrence, Columbus, Ohio, for plaintiff; Alvin J. McKenna, Robert B. McAlister, Columbus, Ohio, Stuart Robinowitz, Richard A. Kurnit, Earl H. Doppelt, Dan Victor, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, of counsel.

Knepper, White, Arter & Hadden, Columbus, Ohio, Bergson, Borkland, Margolis & Adler, Washington, D. C., for ABC defendants; William E. Knepper, John P. Gartland, Columbus, Ohio, Lionel Kestenbaum, Michael D. Ridberg, Gary J. Smith, Washington, D. C., of counsel.

Bricker & Eckler, Columbus, Ohio, Swanson, Midgley, Gangwere, Thurlo & Clarke, Kansas City, Mo., for defendant NCAA; Bruce G. Lynn, Joseph S. Gill, Columbus, Ohio, George H. Gangwere, John J. Kitchen, Richard K. Andrews, Kansas City, Mo., of counsel.

## OPINION AND ORDER

KINNEARY, District Judge.

This matter is before the Court upon plaintiff's motion for a preliminary injunction. Plaintiff Warner Amex Cable Communications, Inc. [Warner] alleges that defendants American Broadcasting Companies, Inc. [ABC], ABC Sports, Inc., and the National Collegiate Athletic Association [NCAA], by means of practices that violate the Sherman Act, 15 U.S.C. Sections 1–3, are preventing it from cablecasting the 1980 football games of The Ohio State University [OSU]. Accordingly, plaintiff seeks a preliminary injunction to restrain defendants and their associates from preventing or hindering plaintiff's ability to cablecast live, regular season OSU games not televised by defendants ABC and ABC Sports.

The Court held an evidentiary hearing on the motion on August 4–6, 1980. Based upon the evidence adduced at that hearing, the pleadings, the memoranda of the parties, and other materials before it, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52, Federal Rules of Civil Procedure.

## Findings of Fact

Plaintiff launched its innovative cable television system known as QUBE on December 1, 1977 (tr. 47). The computerized experimental system is capable of simultaneous multiple channel cablecasting and audience interaction (tr. 46). Plaintiff chose to introduce its new system in a carefully selected geographical area of greater Columbus, Ohio, a city that has become a major test market for new products and services (tr. 47–48). By May, 1980 Warner Amex had approximately 37,100 basic cable subscribers in Columbus, of which approximately 22,700 took QUBE service (defendant ABC's exhibit E at 1).

Columbus is the seat of a distinguished university, OSU, and its world–renowned football team. OSU football enjoys great popularity in Columbus. In recent years the OSU stadium has been filled to its 83,000–person capacity each Saturday that the team plays at home (tr. 305–07). Given the popularity of the OSU games and the severe scarcity of tickets, it seemed highly likely that live[1] cablecasts of the games, both home and away, would attract considerable interest among subscribers and potential subscribers to QUBE.

OSU is, however, a member of the NCAA, a voluntary self–regulatory association that adopts and enforces regulations concerning, *inter alia*, television appearances by the football teams of its member colleges and universities. The NCAA has as a basic purpose "to maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body, and, by so doing, retain a clear line of demarcation between college athletics and professional sports." (Defendant NCAA's exhibit A, appended to the affidavit of Walter Byers.)

The Football Television Plan–the subject of plaintiff's challenge–has as *its* purpose

> to reduce insofar as possible the adverse effects of live television upon football game attendance and, in turn, upon the athletic and related educational programs dependent upon the proceeds therefrom; to spread football television participation among as many colleges as practicable; to reflect properly the image of universities as educational institutions; to promote college football through the use of television; to advance the overall interests of intercollegiate athletics; and to provide college football television to the public to the extent compatible with these other objectives.

(Defendant NCAA's exhibit F, appended to the affidavit of Walter Byers.)

All telecasts of football games played by NCAA member schools must comply with the Plan, which provides for the NCAA[2] to award to a single network the right to simultaneously telecast a series of games and the first right of refusal for "exception" telecasts approved by the NCAA Television Committee.[3]

The series consists of twenty–three programs each season, thirteen featuring games televised nationally and ten featuring games televised regionally (defendant NCAA's exhibit F, appended to the affidavit of Walter Byers, at 18–19). A member institution may not appear more than five times during either two–year period of the Plan (*id.* at 26). The Plan requires the

---

1. OSU games were already being aired as delayed broadcasts (plaintiff's exhibit 28).

2. The approximately 865 members of the NCAA-colleges and universities, conferences, and associations—convene annually to adopt the association's general policies and to elect an eighteen member Council to direct policy between conventions (tr. 257). The Council in turn appoints the members of the Television Committee, which drafts the Plan for member ratification and selects the network with which NCAA will contract (defendant NCAA's exhibit F, appended to the affidavit of Walter Byers, at 16 ·17). The network–NCAA contract expressly incorporates the Plan (defendant NCAA's exhibit E, appended to the affidavit of Walter Byers, at 1) and is signed for NCAA by its executive director upon approval by both the Television Committee and the Council (defendant NCAA's exhibit F, appended to the affidavit of Walter Byers, at 17).

3. Neither the Plan nor the contract gives ABC, the carrying network, express power to determine whether an exception will be permitted.

carrying network to include a designated proportion of Division II and III teams among its series programs and to undertake prescribed broadcasts of supporting programs–pre– and post–game shows, highlights, season review, and the like (*id.* at 25, 39–43).

The Plan serves to limit television exposure of the few most popular collegiate football teams and provides coverage of games and related events that are educationally important but commercially unattractive. It thus fulfills the stated purpose of the NCAA (tr. 262–75, 400; deposition of Fred Jacoby at 9–11). For its part, ABC is also satisfied with the Plan and contract. In order to obtain the exclusive broadcast rights it considers highly valuable, ABC has agreed to pay some $120 million over the four years from 1978 through 1981 and to devote broadcast time to certain low rated and unprofitable telecasts (tr. 424, 431–35).

For many years the NCAA Football Television Plan included a provision, Article 20, to accommodate cable television. From 1972 through 1977 Article 20 permitted the NCAA Television Committee to authorize telecasts by wired systems of games that did not conflict in time with a series game being broadcast in the geographical area by the carrying network (plaintiff's exhibits 8, 9; affidavit of Walter Byers at 14 ¶ 19).

In 1976 plaintiff proposed to OSU the cablecasting of two of its 1977 football games (tr. 51). OSU was receptive; the proposal was put to the Television Committee, which took the position that "on those dates when ABC has not selected a game or games for telecasting and, resultantly, has not set a time for its telecast, a member institution should be afforded the opportunity to conduct a wired systems presentation." (Plaintiff's exhibit 15.) ABC strongly disagreed with the NCAA's interpretation, pointing out that the terms of the Plan and contract permitted it to select games after September up to the Monday preceding a Saturday telecast (defendant NCAA's exhibit F, appended to the affidavit of Walter Byers, at 24; tr. 439). NCAA concurred; no cablecasts of OSU football were approved for 1977 (tr. 440, 469).

When NCAA awarded exclusive telecast rights to ABC for the period 1978–1981, the parties founded their agreement on the 1978–1981 Football Television Plan ratified by the NCAA membership. The Plan then contained a version of Article 20 that had been reworded but in substance continued to permit wired systems telecasts only if they did not conflict in time with series telecasts (defendant NCAA's exhibit C, appended to the affidavit of Walter Byers, at 17–18).

In 1978 plaintiff again proposed to cablecast OSU games not televised by ABC; again, OSU officials responded favorably (plaintiff's exhibit 18; tr. 54). Although no formal application was made to the Television Committee, the NCAA and ABC communicated to plaintiff and OSU their unchanged belief that no exemption was possible under the Plan and contract (tr. 54–55).

Plaintiff therefore sought judicial relief, filing in this court on June 28, 1978 an antitrust action against the present defendants and moving for a preliminary injunction. *Warner Cable Corp. v. American Broadcasting Companies, Inc.*, No. C–2–78–592 (S.D.Ohio E.D., filed June 28, 1978). On July 23, immediately before the scheduled hearing on the motion, the parties reached agreement. Defendants permitted plaintiff to cablecast five OSU games not broadcast by ABC in 1978 and five unbroadcast games in 1979; plaintiff agreed to discontinue its antitrust suit without prejudice and to refrain from further litigation until the conclusion of the 1979 football season (plaintiff's exhibits 35, 36).

The NCAA thereupon revised its Football Television Plan to reflect the agreements between Warner, ABC, and itself. The revision, which was published and widely distributed, purported to make the terms of the agreements concerning cablecasts of OSU football in 1978 and 1979 applicable to all potential cablecasts of football games sponsored by NCAA member institutions for the entire period of the Plan, 1978 through 1981 (defendant NCAA's exhibit F, appended to the affidavit of Walter Byers,

at 27–32, 36–38). Revised Article 16 put cable systems on an equivalent footing with broadcast systems with respect to exception telecasts of sellout Division I games; for an exception to be granted under Article 16, all other admission-charging college games scheduled for the same time in the prescribed geographic area must be sold out. Revised Article 20 allowed the NCAA Television Committee to authorize exception telecasts "for experimental purposes" even when other games in the designated area are not sold out.

The Plan contains a provision, Article 26, allowing the NCAA Television Committee to modify it, subject to approval of the NCAA Council (defendant NCAA's exhibit F, appended to the affidavit of Walter Byers, at 44). The contract between ABC and the NCAA provides: "With regard to Article 26 of the Plan, any modification which adversely affects ABC's rights shall be subject to mutual agreement." (Defendant NCAA's exhibit E, appended to the affidavit of Walter Byers, at 10 ¶ 14).

ABC protested the NCAA's unilateral revisions to Articles 16 and 20, believing that those revisions could lead to significant encroachments upon the markets for series games (plaintiff's exhibit 92, tr. 443, 447). Discussions between ABC and NCAA during the summer of 1979 resulted in agreement that the revisions of the Plan would remain in effect through the 1978 and 1979 football seasons but would be reconsidered in advance of the 1980 season (tr. 448–49). The NCAA Television Committee deliberated in December, 1979 (plaintiff's exhibit 117; tr. 449). On February 13, 1980, ABC informed the NCAA that it agreed to the Committee's retention of revised Article 16 and deletion of Article 20 (tr. 451–52).

Plaintiff conducted its ten OSU football cablecasts in 1978 and 1979. The programs drew a large share of the viewing audience and, until the recent boxing match between Sugar Ray Leonard and Roberto Duran,

were the most heavily subscribed cablecasts presented on QUBE (tr. 68, 107). In 1978 the OSU games were viewed on QUBE by up to four thousand households per game at a price of $9.00 per game or $30.00 for a package of all five games (tr. 66, 132). In 1979 the price was reduced to $5.00 per game or $19.95 for the package and up to six thousand households viewed each of the five games (tr. 67, 122).

Despite the large viewership, the effects of the cablecasts upon the fledgling QUBE system are not easily assessed. The games were not profitable to Warner (defendant ABC's exhibit F). Moreover, there were fewer subscriber purchases of other QUBE programs during the months that included OSU cablecasts (defendant ABC's exhibit J at 2). One of QUBE's own employees concluded that "football's excellent revenue is to some degree, at the expense of revenue from other sources." (*Id.* at 3.) Although the QUBE subscriber base grew appreciably during the last five months of 1978, the period of initial programming of OSU football, the subscriber base declined substantially during the first half of 1979 (tr. 129–30).

Four small colleges and universities within a thirty mile radius of the QUBE subscription area played home football games at the same time as the 1978 and 1979 OSU cablecasts. The effects of the cablecasts upon the football programs of the four institutions—Otterbein College, Capital University, Ohio Wesleyan University, and Denison University—are difficult to determine precisely.[4]

The NCAA distributed to each of the affected schools the sum of $500.00 for each date on which their team played a home game during the time when OSU football was being cablecast by plaintiff (tr. 292, 299, 395). Plaintiff contends that these payments were intended as full compensation for any injury that the four schools might have suffered by virtue of the previ-

---

4. None of the four small schools suffered a decline in attendance at their games from 1978 to 1979 (plaintiff's exhibit 184, tr. 299). However, isolated comparisons of attendance be-

tween two adjacent years do not reflect recurrent effects inherent in the scheduling process (tr. 298–99).

ous cablecasts, and should therefore be the measure of whatever injury is likely to be experienced by them if the 1980 OSU games are presented. Testimony in the record indicates, however, that these payments were partial (tr. 300, 396) and "a conciliatory gesture until they got the cable television situation a little more clear." (Deposition of Michael J. Cleary at 27.)

In fulfilment of its obligations under the settlement agreement, plaintiff employed its interactive technology to poll the OSU game audiences about various matters. Asked whether they would have attended a local college game if QUBE were not cablecasting OSU football on the date in question, approximately 2.7 percent of the households responding on November 4, 1978 and 5 percent of the households responding on October 27, 1979 answered that they would have attended a live game but for the OSU cablecast (plaintiff's exhibits 46, 137).

The significance of these statistics is questionable. The polls were taken after the games, when many viewers were no longer tuned in (tr. 361–62). The responses to other questions in the poll indicate that several persons were viewing the game in each household (plaintiff's exhibits 46, 137); whether only the individual who pressed the response button on the QUBE console (plaintiff's exhibit 208) or all of the viewers present in the household had been diverted from personal attendance at another college game is not known.

Donald Canham, director of athletics at the University of Michigan and a former member of the Television Committee, opined vigorously that availability of all scheduled games of a "major major" team such as OSU for home viewing would have a profound effect upon the football programs of the smaller colleges. He testified that if plaintiff is allowed to cablecast the 1980 OSU season there will be tremendous pressure to televise more live games of superpower teams and that, even as an official of a preeminent football power, he does not want to see a superconference built upon the ruins of the small college programs. (Tr. 399–405).

Undaunted by the ambiguous results of its 1978 and 1979 cablecasts of OSU football, plaintiff was eager to continue them in 1980. OSU officials, correspondingly enthusiastic, applied to the NCAA for exception status under the revised Plan. The letter of application from OSU's athletic director to Thomas Hansen, assistant executive director of the NCAA, invoked revised Article 16 (plaintiff's exhibit 140). Allie Sherman, representing plaintiff in the negotiations for the 1980 games, was shown a copy of that letter but failed to appreciate the omission of any reference to Article 20 (tr. 211–13, 216).

When Mr. Sherman telephoned Mr. Hansen on May 14 Mr. Hansen said that because Article 20 had been eliminated from the Plan several months earlier the only possible exemption would lie under revised Article 16, which was itself being reconsidered by the Television Committee (tr. 164–65). At a meeting on May 22 in Kansas City Mr. Hansen and other representatives of the NCAA reiterated to Mr. Sherman their position that Article 16 governed the proposed cablecasts (tr. 167). One or more of the four small schools within a thirty mile radius were scheduled to play on all but the last two Saturday afternoons of OSU's 1980 schedule (plaintiff's exhibit 201, tr. 168) and one of the two nonconflicting dates was the OSU–Michigan game, which is usually selected by ABC for series broadcast (tr. 168, 354). It was therefore suggested to Mr. Sherman that plaintiff could secure additional games by persuading OSU or the smaller schools to alter their 1980 football schedules or buying out all the empty seats in the stadia of the schools that would be affected by the proposed cablecasts (tr. 169–70).

Mr. Sherman found both alternatives "unrealistic" (tr. 169, 188). He made no personal attempt to calculate to a reasonable approximation the actual cost of purchasing the unsold seats for the conflicting

games, nor was he ever supplied with those calculations by his associates (tr. 186–96).[5]

Upon learning from representatives of the four schools whose games were in conflict that they had refused to shift their schedules but might be interested in receiving beneficial air time on QUBE, Mr. Sherman telephoned Mr. Hansen, who held out some hope that arrangements might yet be made to cablecast the games (tr. 178–79). Mr. Sherman then contacted James Spence, Senior Vice President of ABC sports, to request that ABC waive its right of exclusivity, and was told that ABC was unalterably opposed to the QUBE cablecasts (tr. 179–81). Shortly afterward, plaintiff, concluding that it was making no progress in its efforts to obtain permission to cablecast the OSU games, decided to bring the present action (tr. 183).

### Discussion

■ The Court's determination whether to grant plaintiff preliminary injunctive relief rests upon four standards set forth by the United States Court of Appeals for the Sixth Circuit in *Mason County Medical Association v. Knebel*, 563 F.2d 256, 261 (CA 6, 1977):

1. Whether the [plaintiff has] shown a strong or substantial likelihood or probability of success on the merits.

2. Whether the [plaintiff has] shown irreparable injury.

3. Whether the issuance of a preliminary injunction would cause substantial harm to others.

4. Whether the public interest would be served by issuing a preliminary injunction.

The Court will address each requirement in turn.

### I. Probability of Success on the Merits

Plaintiff identifies three alleged antitrust violations: (1) the NCAA is an unlawful cartel which, through its Television Plan, restricts competition in order to benefit its members; (2) the NCAA, as an entity with monopoly power, has unlawfully granted ABC exclusive access to the "product"; and (3) the NCAA and ABC have conspired to monopolize various markets.

■ The first two allegations charge violation of Section 1 of the Sherman Act, which provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal ...." 15 U.S.C. Section 1. As the Supreme Court has repeatedly stated, Section 1 is not to be read literally, lest private contract law be obliterated. *National Society of Professional Engineers v. United States*, 435 U.S. 679, 687–88, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978) (*citing United States v. Topco Associates*, 405 U.S. 596, 606, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1974); *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918)). Instead,

> Congress ... expected the courts to give shape to the statute's broad mandate by drawing on common–law tradition. The Rule of Reason, with its origins in common–law precedents long antedating the Sherman Act, has served that purpose. It has been used to give the Act both flexibility and definition, and its central principle of antitrust analysis has remained constant.

435 U.S. at 688, 98 S.Ct. at 1363 [footnotes deleted].

■ Only under special circumstances will a challenged practice be declared illegal per se, without detailed scrutiny of its actu-

---

**5.** Computations have, however, been performed by both sides and are included in the record before the Court. The estimated cost to purchase all unsold seats for all nine dates with conflicting games in 1980 ranges from $143,948 (defendant NCAA's exhibit T) to $173,072 (plaintiff's exhibit 242). Moreover, plaintiff could buy out four of the nine conflicting dates in 1980–September 27, October 11, October 25 and November 8–for a total cost of from $16,518 (defendant NCAA's exhibit T) to $32,118 (plaintiff's exhibit 242). The corresponding figures for the 1981 season are $120,428 for all nine conflicting dates and $16,518 for the five lowest cost dates (defendant NCAA's exhibit T).

al effect on competition. As the Supreme Court has explained,

> there are certain agreements or practices which because of their *pernicious effect on competition and lack of any redeeming virtue* are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.

*Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958) [emphasis added]. Because its application may unnecessarily curtail reasonable, even pro–competitive, practices, a per se rule will not be invoked until the courts have gained considerable experience with the challenged activities, *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 19 n. 33, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979), and have found them to be "naked restraints of trade with no purpose except stifling of competition." *White Motor Co. v. United States,* 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963). In *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 49–50, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977) [emphasis added], the Court stressed that *"[p]er se* rules of illegality are appropriate only when they relate to conduct that is *manifestly anti–competitive."*

■ It has long been the rule that horizontal agreements to restrict output are per se illegal because such agreements create the potential for price fixing, which is per se violative of the Sherman Act. *United States v. Socony–Vacuum Oil Co., Inc.,* 310 U.S. 150, 218, 60 S.Ct. 811, 841, 84 L.Ed. 1129 (1940). The NCAA football television plan, if viewed as an agreement among horizontal competitors to limit output, would be a per se violation of the Sherman Act by virtue of its restrictions upon the amount of college football that can be televised. *See* Hochberg & Horowitz, *Broadcasting and CATV: The Beauty and the Bane of Major College Football,* 38 Law & Contemp. Prob. 112 (1973); *Note, Tackling Intercollegiate Athletics: An Antitrust Analysis,* 87 Yale L.J. 655, 662 (1978). Nevertheless, a practice that would be de-

clared invalid per se if it occurred in a purely commercial context should not be subject to a per se rule in the context of singularly integrated commercial and educational activities with which no court has had considerable experience.

■ A parallel process of reasoning is appropriate to the challenged exclusivity of ABC's contract with NCAA. Whether that contract unlawfully preempts the only source of supply for an unique product is a novel and complex question not suited for application of a per se rule.

We are strengthened in our conclusion by the Supreme Court's opinion in *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). Although it held that defendant's rule prescribing minimum fees for legal services violated Section 1 of the Sherman Act, the Court noted:

> The fact that a restraint operates upon a profession as distinguished from a business is, of course, relevant in determining whether that particular restraint violates the Sherman Act. It would be unrealistic to view the practice of professions as interchangeable with other business activities, and automatically to apply to the professions antitrust concepts which originated in other areas. The public service aspect, and other features of the professions, may require that a particular practice, which could properly be viewed as a violation of the Sherman Act in another context, be treated differently. We intimate no view on any other situation than the one with which we are confronted today.

421 U.S. at 788–89 n. 17, 95 S.Ct. at 2013 n. 17. The district court, whose conclusions were ultimately upheld, appeared to find the fee schedule per se violative of the Sherman Act, 355 F.Supp. 491, 493 (1973), and the Supreme Court did not clearly articulate the standard that it applied. The Court subsequently observed, however, in *National Society of Professional Engineers,* 435 U.S. at 696, 98 S.Ct. at 1367 [emphasis added] that the *Goldfarb* footnote "cannot be read as fashioning a broad exemption

*under the Rule of Reason* for learned professions."

■ We are persuaded that the Rule of Reason, rather than a per se rule, must be applied to the defendants' activities that have been challenged as violative of Section 1 of the Sherman Act. We do not find those activities unequivocally "pernicious" in their effect upon competition, or totally lacking "any redeeming virtue." This is not to say that defendants' conduct is necessarily legal, but only to say that the declaration of illegality should not be made in advance of analysis dictated by the rule of reason.

Applying the rule of reason, this Court must proceed to evaluate the competitive effects of the challenged agreements "by analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed." 435 U.S. at 692, 98 S.Ct. at 1365. Although the record of this action is already substantial the Court is nevertheless disinclined to embark upon its task of searching and detailed analysis before all parties have had full opportunity to be heard on the merits. From our preliminary consideration "whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition," *Chicago Board of Trade v. United States*, 246 U.S. at 238, 38 S.Ct. at 243, quoted in *National Society of Professional Engineers*, 435 U.S. at 691, 98 S.Ct. at 1365, we do not discern a substantial likelihood that plaintiff will prevail upon the merits of its Section 1 claim. We reiterate that our present inability to predict the eventual outcome of this action does not imply that plaintiff will not prevail; this discussion is addressed solely to the standards for preliminary injunctive relief.

■ Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations . . . ." 15 U.S.C. Section 2. Plaintiff asserts that defendants have blacked out the majority of college football games within the purview of NCAA and have conspired to prevent or attempt to prevent cablecasts that would compete with ABC's series telecasts. To prevail upon its Section 2 claim plaintiff must show, first, possession of monopoly power in the relevant market, and, second, willful acquisition or maintenance of that power. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703, 16 L.Ed.2d 778 (1966).

■ At the threshold we must consider the definition of the relevant market, for "[w]ithout a definition of that market there is no way to measure [defendant's] ability to lessen or destroy competition." *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965). The standard for determining a Section 2 market is whether products are "reasonably interchangeable by consumers for the same purposes." *United States v. E. I. DuPont de Nemours & Co.*, 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956). Plaintiff urges that the NCAA football games—the only live games televised on Saturday afternoons—are unique events for which there are no substitutes. It considers OSU games—a perennial television favorite—unique and a separate market in their own right. Defendants counter that these games are not unique as the law contemplates that term but must be considered as a species of television entertainment programming generally.

In *International Boxing Club of New York, Inc. v. United States*, 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959) the Supreme Court affirmed the district court's ruling on the merits that Sections 1 and 2 of the Sherman Act had been violated by agreements that gave defendant promoters exclusive control over a substantial portion of championship boxing. The district court made detailed findings of fact concerning revenue and television ratings and concluded that championship boxing contests constituted a separate and identifiable market, distinct from professional boxing matches

in general. By contrast, the United States District Court for the Southern District of New York found feature films for television exhibition reasonably interchangeable with other television programming material. *United States v. Columbia Pictures Corporation*, 189 F.Supp. 153, 183–92 (S.D.N.Y. 1960).

The circumstances of this case are related both to *International Boxing Club*, which dealt with live athletic events, and to *Columbia Pictures*, which treated an exclusive license to distribute television entertainment. Neither case is directly on point, however. *International Boxing Club* concerned restrictions upon the very performance of athletic contests by individual professional athletes; the NCAA football games are amateur games that will be played whether or not they are televised. *Columbia Pictures* implicated the availability for broadcast of some six hundred old movies; the issue in the instant action is whether the OSU games will be cablecast live. Most significantly, however, the district courts in both *Columbia Pictures* and *International Boxing Club* reached their conclusions about relevant market only after they had conducted extensive factual inquiry.

■ We agree most heartily with Judge Tamm: "Obviously, entertainment is an industry in which antitrust concepts such as product market and cross–elasticity of demand are exceptionally difficult to apply ...." *National Association of Theatre Owners v. Federal Communications Commission*, 420 F.2d 194, 204 (CADC 1969) [footnotes deleted]. The question of market definition in this case is a close one that might be resolved either way following trial on the merits; plaintiff has not shown a substantial likelihood that it will prevail with respect to this essential element of its claim. It therefore follows that neither conspiracy nor the existence or acquisition of monopoly power can be evaluated on even a preliminary basis.[6]

## II. Irreparable Injury

■ Irreparable harm sufficient to justify injunctive relief is comprised of "substantial injury to a material degree coupled with the inadequacy of money damages." *Tully v. Mott Supermarkets, Inc.*, 337 F.Supp. 834, 850 (D.N.J.1972). With respect to the first aspect, it is problematic whether plaintiff will suffer substantial or material injury if it cannot cablecast the OSU games this season. As to the second, it lies within plaintiff's own power to put a price tag on potential damages.

Plaintiff asserts that because its business consists of satisfying its subscribers, the games are "extremely important to the prestige of our system, to the perception of our subscribers of our overall service." (Tr. 66.) In effect, plaintiff claims injury to a species of good will. Although injunctive relief is available to stem the loss of unquantifiable customer good will, *see, e. g., Blackwelder Furniture Company of Statesville, Inc. v. Seilig Manufacturing Company*, 550 F.2d 189, 197 (CA 4, 1977), not every claim of injury to good will is entitled to that remedy. Among injuries that are not susceptible to monetary measure it is necessary to distinguish the severe from the mild and the speculative.

Under circumstances not dissimilar from those here presented, the Court of Appeals for the Third Circuit found that the district court had exceeded its discretion in granting injunctive relief to a theater owner against a film distributor that failed to deliver for exhibition a first–run motion picture. *A.L.K. Corporation v. Columbia Pictures Industries, Inc.*, 440 F.2d 761 (CA 3, 1971). The district court had ruled that plaintiff's inability to obtain the "unique" film in question might cause an intangible loss of good will that could not be redressed at law because damages would be difficult, if not impossible, to prove. On appeal, the

---

**6.** Whether monopolization is measured by the market share of the alleged monoplist, *United States v. Grinnel Corp.*, 384 U.S. at 571, 86 S.Ct. at 1704, or by the power to control prices or exclude competition, *United States v. E. I. DuPont de Nemours & Co.*, 351 U.S. at 391, 76 S.Ct. at 1004, its assessment rests upon knowledge of the relevant market.

court, assuming the existence of an intangible good will with a value not monetarily measurable, nevertheless failed to discern from the record that this intangible asset had been damaged, and cautioned that "[t]he injury contemplated by the denial of a preliminary injunction must be actual and of serious consequence, not merely theoretical." 440 F.2d at 764.

Upon examination of the record in this action, the Court is unable to find that the potential injury to plaintiff goes beyond the theoretical. Although the ten OSU football games cablecast during 1978 and 1979 attracted more viewers than any other event except the recent Leonard/Duran fight, there is evidence that the games tended to divert viewers from other premium (pay per view) events in both years (defendant ABC's exhibits J, K; tr. 68, 107). Moreover, the evidence simply does not support plaintiff's conclusory assertion that the games help QUBE to gain and keep subscribers (tr. 133, 136–37). During the 1979 football season QUBE's subscriber base did not grow as rapidly as it had in 1978, despite reduction of the per game premium charge from $9.00 to $5.00 (tr. 133–134). QUBE is not now a profitable operation overall and the subscription revenues from cablecasting the 1978 and 1979 games fell short of the expense to acquire and disseminate the games (plaintiff's exhibit 126, tr. 49).

These facts in themselves would not preclude a finding of substantial injury. Preliminary injunctive relief has been accorded to prevent uncertain losses of profit and good will that would have resulted from denial of the opportunity to initiate a new process or technology. *Dino deLaurentiis Cinematografica, S.p.A. v. D–150, Inc.*, 366 F.2d 373 (CA 2, 1966).

Plaintiff stresses its "experimental" status as a new technology (tr. 44–49). The Court nevertheless concludes that, with respect to the OSU games at issue, QUBE is in the position of any startup enterprise. Plaintiff has not shown the two–way communications feature that distinguishes QUBE from other cable systems to be more than peripherally relevant to its past or proposed presentations of OSU football. As to the effect of the games upon the prospects of the entire enterprise, which undoubtedly features novel technology, the plaintiff has not persuaded the Court that deprivation of the games pending determination of this action on its merits will work an irreparable injury.

We are guided to this conclusion by the analysis of Judge Duncan, speaking for the Court in *Columbia Gas Transmission Corporation v. Larry H. Wright, Inc.*, 443 F.Supp. 14 (S.D.Ohio, E.D.1977). Defendant gas producers had cancelled their gas purchase agreements with plaintiff, which refused to pay for current gas supplies until alleged overpayments were corrected. Plaintiff, seeking preliminary injunctive relief, asserted that it and its customers would suffer irreparable harm if they were denied access to the gas under contract. The Court found, however, that defendants had advised plaintiff that they would continue to supply gas if plaintiff would pay for current deliveries:

> Plaintiff, then, was assured of receiving the natural gas if it would leave the question of overpayments and unrecovered advancements to another day, when by agreement or by litigation the dollar questions could be resolved. *The only thing standing between Columbia and the gas was money*; if loss of the gas would have constituted true irreparable harm to plaintiff, it would have paid the money and brought an action for the debt and for an accounting.

443 F.Supp. at 24 [emphasis added].

The Court concludes that the only thing standing between Warner Amex and the 1980 OSU games is money in an amount well within its capacity to expend in anticipation of a decision of its antitrust action on the merits. By plaintiff's own reckoning it could buy out four conflicting dates for $32,118 or all conflicting dates for $173,072 (plaintiff's exhibit 242). Plaintiff, a corporation with revenues of $81.3 million and operating income of $12.2 million in 1979 (defendant ABC's exhibit A at 50) can

scarcely be heard to complain that it could not bear this expense, which it would regain should it prevail on the merits.

Because plaintiff could cablecast the 1980 games without the Court's intervention, we need not decide whether plaintiff's alleged injury would merit preliminary injunctive relief on first amendment grounds. *See* plaintiff's memorandum in support of motion for temporary restraining order and preliminary injunction, July 1, 1980, at 32–33. We note, however, that the first amendment implications of this action are far from clear.[7]

### III. Substantial Harm to Others

The Court believes that a preliminary injunction would pose a significant threat of substantial harm to defendants and third parties. ABC would suffer erosion of the valuable exclusivity for which it bargained and contracted. Moreover, ABC is likely to encounter additional attempts to encroach upon its exclusivity in other regions should plaintiff be accorded preliminary injunctive relief in Columbus. The potential diminution of gate receipts and alumni allegiance at the small schools in the Columbus area threatens both the schools themselves and the NCAA, which would be thwarted in its efforts to protect amateur athletics.

### IV. Public Interest

OSU football cablecasts are quite popular among residents of the QUBE viewing area; these football fans are keenly "interested" in viewing the games in their homes. The desire of certain members of the public for commercial entertainment cannot, however, be equated with the public interest.

There is nevertheless a genuine public interest in development of new technology—indeed, of all legitimate business enterprise—free of anticompetitive restraints. Against that interest must be balanced the public interests in protection of private contractual rights and preservation of amateur athletics within higher education. In light of plaintiff's uncertain probability of success on the merits, the Court concludes that considerations of public interest weigh against issuance of a preliminary injunction.[8]

7. *American Broadcasting Companies, Inc. v. Cuomo*, 570 F.2d 1080 (CA 2, 1977), cited by plaintiff to support its contention that defendants' violation of plaintiff's and its audience's first amendment rights was automatically irreparable injury, is distinguishable. In *Cuomo* defendants arrested and threatened to arrest members of plaintiff's management crew for criminal trespass on the premises of the campaign headquarters of candidates for political office. Plaintiff was at that time embroiled in a labor dispute; the other networks, which were not affected by the strike, were granted free access to the headquarters. The district court refused to enjoin enforcement of the criminal trespass statute and to restrain defendants from refusing access to plaintiff's crew. The appellate court reversed, ruling that once the candidates had invited some members of the press into their private premises, those premises became dedicated to public communications use, for

> the danger would be that those of the media who are in opposition or who the candidate thinks are not treating him fairly would be excluded. And thus we think it is the public which would lose.

> In short, we do not think that the particular place involved is necessarily the outer limit of the constitutional protection of the First Amendment. We think that once there is a public function, public comment, and partici-

pation by some of the media, the First Amendment requires equal access to all of the media or the rights of the First Amendment would no longer be tenable.

570 F.2d at 1083.

*Cuomo*, unlike the case before us, implicated fundamental first amendment doctrine: the electorate's right of access to political speech free of government censorship. Moreover, even if the NCAA is considered a state actor for certain purposes -such as regulating student athletic participation on the basis of alienage, *Howard University v. NCAA*, 510 F.2d 213 (CADC, 1975) it is by no means certain that it should be so categorized for all purposes.

8. The findings concerning public interest relate only to the preliminary injunctive relief that is the subject of this opinion and order. In deciding this case on its merits the Court will of course be mindful that

> the purpose of [antitrust analysis] is to form a judgment about the competitive significance of the restraint; it is not to decide whether a policy favoring competition is in the public interest, or in the interest of the members of an industry. Subject to exceptions defined by statute, that policy decision has been made by the Congress.

*National Society of Professional Engineers v. United States*, 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978) [footnote omitted].

*Conclusions of Law*

The Court has jurisdiction of this action under 28 U.S.C. Section 1337.

Plaintiff has failed to demonstrate a strong or substantial likelihood or probability of success on the merits of its claim that it has been injured by defendants' acts in violation of Sections 1 and 2 of the Sherman Act.

Plaintiff has failed to show that it will be irreparably injured if the Court does not issue an injunction restraining defendants from interfering with plaintiff's proposed simultaneous cablecasts of the 1980 OSU football games.

The preliminary injunction sought by plaintiff would pose a significant threat of substantial harm to defendants and to the member institutions of the NCAA.

Plaintiff has not demonstrated that the issuance of a preliminary injunction would serve the public interest.

WHEREUPON, the Court determines that plaintiff's motion for a preliminary injunction is without merit and it is therefore DENIED.

IT IS SO ORDERED.