**GENOVESE DRUG STORES, INC.**

v.

**BERCROSE ASSOCIATES;** Connecticut Packing Company, Inc.; and Fotomat Corporation.

Civ. No. H–82–1070.

United States District Court, D. Connecticut.

May 23, 1983.

Martin H. Sokolow, Jr., Barry S. Feigenbaum, Thomas A. Rouse, Byrne, Shechtman & Slater, Hartford, Conn., for plaintiff.

Rolland Castleman, Lessner, Rottner, Karp, Plepler & Castleman, Manchester, Conn., for defendants, Bercrose Associates and Connecticut Packing Co., Inc.

Mark R. Kravitz, Wiggin & Dana, New Haven, Conn., for defendant, Fotomat Corp.

## RULING ON MOTION FOR PRELIMINARY INJUNCTION

CLAIRE, Senior District Judge.

Pursuant to Fed.R.Civ.P. 65, the plaintiff has moved for the issuance of a preliminary injunction to restrain the defendants from violating a restrictive covenant contained in the plaintiff's lease, until such time as this case is finally adjudicated. Following a full evidentiary hearing, the Court finds that the plaintiff has met its burden and is entitled to the preliminary injunction requested. Accordingly, the plaintiff's motion for preliminary injunction is granted. In accordance with Fed.R.Civ.P. 52(a), the foregoing shall constitute the findings of fact and conclusions of law.

### Findings of Fact

1. The plaintiff, Genovese Drug Stores, Inc. ("Genovese"), is a New York corporation qualified to do business in Connecticut, with its principal offices located at 80 Marcus Drive, Melville, New York. Genovese operates sixty-six (66) full-line drug stores in the Northeastern United States, including twelve (12) stores in Connecticut.

2. The defendant, Bercrose Associates ("Bercrose"), is a Connecticut partnership comprised of Irving Bercowetz, Herman Bercowetz and Israel Rosenthal, all of Bloomfield, Connecticut. Bercrose has an office and principal place of business at 335 Cottage Grove Road, Bloomfield, Connecticut, Bercrose owns and operates a portion of the overall tract that comprises the Copaco Shopping Center ("Shopping Center"), in Bloomfield, Connecticut.

3. The defendant, Connecticut Packing Company, Inc. ("Copaco"), is a Connecticut corporation with four (4) shareholders Irving Bercowetz and Herman Bercowetz each own one-third of the corporation, and the remaining one-third is owned by Israel and Rhoda Rosenthal. It should be noted that all shareholders of Copaco, except the last named individual, are partners in Bercrose. Irving Bercowetz is the president of Copaco. The office and principal place of busi-

ness for Copaco also is located in the same identical location as Bercrose, i.e., 335 Cottage Grove Road, Bloomfield, Connecticut. Copaco owns and operates the remainder of the Shopping Center not owned by Bercrose, and also operates a food supermarket at the Shopping Center.

4. Philip Johnson is and has been the controller of both Copaco and Bercrose for eighteen years. He has authority to act on behalf of both business entities, and manages both entities from a common office at 335 Cottage Grove Road, Bloomfield, Connecticut.

5. The defendant, Fotomat Corporation ("Fotomat"), is a Delaware corporation, qualified to do business in Connecticut, with its principal office located at 64 Danbury Road, Wilton, Connecticut. Fotomat is engaged in the sale of photographic film and film processing services at various locations throughout the United States. Fotomat's principal method of selling its products and services is through standard drive-in kiosks located in the parking lots of shopping centers, although it does have some in-line store locations.

6. In 1947, Copaco purchased a parcel of land situated on Cottage Grove Road, in Bloomfield, Connecticut, constituting the major part of the property on which the entire Shopping Center is located. In 1970, Copaco conveyed a portion of this parcel to Bercrose by a duly recorded quit-claim deed.

7. On September 22, 1971, Bercrose and Copaco executed an agreement for the joint development of the Shopping Center ("Joint Development Agreement"), whereby each agreed, *inter alia,* to promote the development of the common areas of the Shopping Center as a fully-integrated facility and provide for certain restrictions on the common use of the respective tracts. On October 12, 1971, the Joint Development Agreement was recorded on the land records of the Town of Bloomfield under the names of both Copaco and Bercrose. This document was recorded in the grantor index of the land records under both names, one to the other, and is thus within the chain of title of each of the two business entities.

8. The third and fourth recitals of the Joint Development Agreement state the purpose of the agreement:

"WHEREAS, the parties, notwithstanding their separate ownership of said portions of the shopping center, desire to develop, construct, operate and manage said shopping center as one, fully-integrated facility so that neither the business establishments located therein nor their customers will be affected, in any practical respect, by the separate ownership of portions thereof; and

WHEREAS, in order to accomplish said objective, the parties have agreed to grant each other certain rights and to restrict their respective portions of the shopping center in certain respects.

9. Paragraph 1 of the Joint Development Agreement, entitled "Prohibition Against Building in Common Areas", states in pertinent part:

"Neither of the parties shall build or erect, or suffer to be built or erected, any building or structure upon any portion of the property owned by it which is shown upon Exhibit 2 as being used or reserved as a common area for the use and benefit of the entire shopping center, including but not limited to those areas shown as parking (including not only the parking spaces but also the lanes between rows of parking spaces), access and egress drives, service drives and areas and landscaped areas, unless the party desiring to erect such additional building(s) or structure(s) *shall have first obtained the written consent of the other party."* (Emphasis added).

10. On October 6, 1971, Bercrose leased a portion of the property located at the Shopping Center to Genovese for the operation of a retail drug store for an initial term of twenty (20) years (hereinafter the "Bercrose-Genovese Lease"). The Bercrose-Genovese Lease contained a restrictive covenant in which Bercrose agreed that it would not demise any portion of the Shopping Center to any "drive-in operation whose principal business is the receipt and process-

ing of photographic film for development, including, but not limited to, drive-ins known as 'Foto-Mat'."

11. Consistent with the terms of the Joint Development Agreement, Irving Bercowetz, in his capacity as president of Copaco, executed a statement entitled "Consent and Agreement" ("Consent"), in which Copaco agreed to be bound by the lease terms with respect to the portions of the Shopping Center owned and operated by Copaco. This Consent was executed on October 6, 1971 and was appended to the Bercrose-Genovese Lease.

12. On March 10, 1972, pursuant to Conn.Gen.Stat. § 47–19, a memorandum of the Bercrose-Genovese Lease ("Memorandum of Lease") was recorded on the Bloomfield Land Records under the name of Bercrose as grantor, and Genovese as grantee. The Memorandum of Lease states that a copy of the entire lease document is on file at the offices of Bercrose's attorneys. The Memorandum of Lease also states the term of the lease and its option of renewal and mortgage provisions, but it contains no mention of the restrictive covenant prohibiting drive-in photo kiosks nor does it refer to the Consent in which Copaco agreed to be bound by the terms of the Bercrose-Genovese Lease.

13. The restrictive covenant contained in the Bercrose-Genovese Lease is specifically limited to drive-in film processing operations and does not restrict film processing sales or service by other tenants of in-line stores within the Shopping Center. Other tenants of the Shopping Center presently do provide film processing sales and service from in-line stores, and nothing in the Bercrose-Genovese Lease would restrict Fotomat from opening and operating an in-line store within the Shopping Center.

14. On May 5, 1982, Philip Johnson, controller of both Bercrose and Copaco and the employee in charge of leasing for both owners of the Shopping Center, wrote to Fotomat on behalf of Bercrose to advise Fotomat of the availability of a 900 square foot store in the Shopping Center that had recently become vacant.

15. Shortly after May 5, 1982, Arthur Johnson, a real estate representative for Fotomat responded to Philip Johnson's offer. After preliminary discussions, on or about May 19, 1982, Fotomat indicated that it did not want to lease the available 900 square foot store, but it would consider other space in the Shopping Center for an in-line store or for a drive-in kiosk. Fotomat was never told of the existence of the restrictive covenant in the Bercrose-Genovese Lease during these communications, nor did Fotomat inquire about the possible existence of such restrictions.

16. Philip Johnson discussed the idea of putting a Fotomat drive-in kiosk in the Shopping Center with Irving Bercowetz, a principal in both Bercrose and Copaco, and the principal partner in Bercrose who originally negotiated and approved the restrictive covenant contained in the Bercrose-Genovese Lease. Despite his direct, personal involvement in the creation of the restriction against photo kiosks, Irving Bercowetz responded favorably to the idea of a Fotomat kiosk. Philip Johnson notified Fotomat that a kiosk was acceptable and met with Arthur Johnson to locate the kiosk on the Shopping Center's parking lot. Initially, they agreed to locate the kiosk on the Bercrose portion of the parking lot. Later, after concluding that such location would interfere with snow removal at the Shopping Center, Philip Johnson notified Fotomat that the kiosk would have to be located on the portion of the Shopping Center's parking lot that is owned by Copaco. While there is no direct evidence to indicate that the location of the kiosk was moved to avoid a conflict with the restrictive covenant contained in the Bercrose-Genovese Lease, the Court finds that Philip Johnson's testimony was not credible when he testified that he "forgot" about said restrictive covenant. The Court does not believe that Philip Johnson suffered from a lapse of memory and instead finds that he acted in bad faith when he negotiated the lease with Fotomat which was in direct violation of the restrictive covenant contained in the Bercrose-Genovese Lease. The Court fur-

ther finds that the actions of Irving Bercowetz and Philip Johnson were wilful and deliberate.

17. Fotomat was at all times aware that Philip Johnson had authority to act for both Bercrose and Copaco in lease negotiations. Bercrose was at all times aware of the negotiations with Fotomat for lease of the kiosk, and it made no objection thereto.

18. Fotomat did not conduct a title search of the 36 square feet of parking lot that it was leasing. Instead, Fotomat requested and obtained from Copaco a guarantee that there were no restrictions on Fotomat's use of the property for operation of its drive-in kiosk.

19. If Fotomat had conducted a title search for the property it was leasing, it would have discovered, in its chain of title, the Joint Development Agreement between Copaco and Bercrose. Fotomat is thus deemed to have constructive notice of the terms contained therein, including Paragraph 1 of the Development Agreement which required the written consent of both Bercrose and Copaco for the construction of any building or structure upon any portion of the common area of the Shopping Center reserved for parking. Such written consent was never formally obtained, even though the property leased to Fotomat was on the common area reserved for parking. An examination of the Joint Development Agreement would have also revealed that Bercrose and Copaco were bound to develop the Shopping Center as one fully-integrated facility and that the business establishments located therein would not be affected, in any practical respect, by the separate ownership of portions thereof.

20. On June 15, 1982, Irving Bercowetz signed a modified version of the National Fotomat Standard Lease, in his capacity as president of Copaco. On June 28, 1982, Alan Jones, real estate director of Fotomat, signed the Fotomat Lease on behalf of Fotomat and transmitted an executed copy to Copaco.

21. Philip Johnson acknowledged that he never advised Fotomat of the existence of the restrictive covenant contained in the Bercrose-Genovese Lease, which prohibited drive-in photo kiosks, before Copaco and Fotomat entered into their lease agreement and it is undisputed that Fotomat did not have *actual* notice of the restrictive covenant at that time.

22. Approximately thirty-five (35) to forty-five (45) days after the Fotomat Lease was executed, Fotomat began construction of the kiosk by preparing the site and foundation. On September 16, 1982, the prefabricated kiosk was placed on the site. The roof of the kiosk was bolted together and the kiosk was placed on the base.

23. After Fotomat had completed the foregoing, on September 24, 1982, Jerome Stengel, chief financial officer of Genovese, contacted Philip Johnson to demand removal of the kiosk in accordance with the restrictive covenant in the Bercrose-Genovese Lease.

24. On September 27, 1982, Philip Johnson notified Fotomat for the first time of the existence of the restrictive covenant prohibiting drive-in photo kiosks. After notification from Johnson that the restrictive covenant was in conflict with its own lease, Fotomat briefly halted the remaining construction in order to permit its attorneys to review the enforceability of the restrictive covenant. On October 14, 1982, construction resumed and was completed before this lawsuit commenced.

25. The total cost to construct the Fotomat kiosk was $15,881.00. As of September 27, 1982, approximately one-half of this amount had been committed. At this time, the prefabricated kiosk was still able to be removed and used by Fotomat at another location.

26. On November 9, 1982, Genovese commenced this lawsuit and obtained a temporary restraining order from this Court, (Cabranes, J.) prohibiting Fotomat from operating the drive-in photo kiosk. This restraining order has been extended by stipulation of the parties while this motion has been pending.

27. After the commencement of this action, Joseph A. Madenberg Associates conducted a survey of customers of the Genovese store in the Shopping Center. The survey concluded that 96.2% of Genovese's customers buy other items in the store when they are there to buy film or to pick up processed film. There is no way to definitively measure the dollar amount of such "impulse sales" that Genovese would lose if the Fotomat kiosk were to open at the Shopping Center, which primarily caters to transient trade.

### Discussion of Law

■ This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332 by virtue of the diversity of citizenship of the parties. In *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), the Supreme Court held that when a federal court is hearing a case within its diversity jurisdiction, the federal court must apply the law of the state in which it sits. Where injunctive relief is sought, a federal court must look to state law to determine whether a party is entitled to equitable remedial rights. *Perfect Fit Industries, Inc. v. Acme Quilting Co.,* 646 F.2d 800, 806 (2d Cir.1981); *Franke v. Wiltschek,* 209 F.2d 493 (2d Cir.1953); *see also* 2 *Moore's Federal Practice* ¶ 2.09 (2d ed. 1982). This action arose out of a lease involving real property located in the State of Connecticut; accordingly, the Court will apply the state law of Connecticut. *See Borman's, Inc. v. Great Scott Super Markets, Inc.,* 433 F.Supp. 343, 346 (E.D.Mich. 1975).

In *Hartford Electric Light Co. v. Levitz,* 173 Conn. 15, 376 A.2d 381 (1977), the Connecticut Supreme Court held that an action for the enforcement of a restrictive covenant is an exception to the general rule that substantial irreparable injury must threaten before an injunction will issue. Relieved of the requirement of proving irreparable harm, the plaintiff could be entitled to an injunction to prevent violation of a restrictive covenant "so long as such relief is not inequitable." *Id.* at 22, 376 A.2d 381. The court explained that this rule did not require the issuance of any injunction whenever enforcement of a restrictive covenant is sought.

In *Hartford Electric Light,* supra, the court did not require the usual demonstration of irreparable harm, but noted that if the restrictive covenant was violated, the potential harm to the plaintiff "may be not compensable in money to the plaintiff and to its affected customers." 173 Conn. at 18, 376 A.2d 381. Similarly, if a Fotomat kiosk were opened at the Shopping Center, Genovese stands to suffer an immeasurable loss in pedestrian traffic and impulse sales that would not be compensable in money damages. Accordingly, the Court finds that Genovese has demonstrated a significant threat of possible irreparable harm that it would suffer if a preliminary injunction is not granted.

■ The plaintiff, Genovese, bargained for and obtained the restrictive covenant pertaining to drive-in photo kiosks from its lessor, Bercrose, and the fee owner of the remainder of the Shopping Center, Copaco. A court of equity will enjoin a violation of a restrictive covenant where the restraint imposed by the covenant is reasonable and where there is actual or constructive notice of the restrictive covenant. *See Hartford Electric Light Co., supra; Moore v. Serafin,* 163 Conn. 1, 301 A.2d 238 (1972); *Lampson Lumber Co. v. Caporale,* 140 Conn. 679, 685, 102 A.2d 875 (1954); *Dick v. Sears Roebuck & Co.,* 115 Conn. 122, 160 A. 432 (1932).

■ The well-established rule under the common law is that an anti-competitive covenant ancillary to a lawful contract is enforceable if the restraint upon the trade is reasonable. *Elida, Inc. v. Harmor Realty Corp.,* 177 Conn. 218, 225, 413 A.2d 1226 (1979). The restraint must be limited in its operation with respect to time and place and afford no more than a fair and just protection to the interests of the party in whose favor it is to operate, without unduly interfering with the public interest. *Id.* at 226, 413 A.2d 1226. A prohibition against the conduct of a rival business contained in a deed has been held not to violate public

policy where the restriction is limited to a particular piece of land, for a reasonable purpose and for a reasonable length of time. *Dick v. Sears Roebuck & Co.,* 115 Conn. 122, 160 A. 432 (1932).

■ The Court finds that the restrictive covenant contained in the Bercrose-Genovese Lease was reasonably limited in time and scope because it affected only the property within the Shopping Center, and its duration was limited to the term of the lease. The evidence established that the restrictive covenant provided fair protection for Genovese's legitimate business interests in that the restriction was designed to enhance pedestrian traffic and thus encourage consumer trade and prevent transient, drive-through vehicular traffic. Although restrictive covenants in shopping center leases may be less common today than they were in the past, they are rarely held invalid on the grounds of unreasonableness. *See generally* Annotation: Lease—Covenant Against Competition, 97 A.L.R.2d 4 (1964).

■ Fotomat contends that the restrictive covenant violates state and federal antitrust laws and is contrary to public policy. The Supreme Court has adopted the rule of reason as the standard of analysis for scrutinizing most business relations under the antitrust laws. *See, e.g., Broadcast Music, Inc. v. Columbia Broadcasting,* 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979); *National Society of Professional Engineers v. United States,* 435 U.S. 679, 687–88, 98 S.Ct. 1355, 1363–64, 55 L.Ed.2d 637 (1978); *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). The majority of courts that have considered the antitrust implications of restrictive covenants contained in shopping center leases have applied the rule of reason. *See, e.g., Harold Friedman, Inc. v. Thorofare Markets,* 587 F.2d 127, 141 (3d Cir.1978); *Optivision, Inc. v. Syracuse Shopping Center Assoc.,* 472 F.Supp. 665 (N.D.N.Y.1979); *Borman's, Inc. v. Great Scott Super Markets, Inc.,* 433 F.Supp. 343 (E.D. Mich.1975). The Connecticut Supreme Court has also applied the rule of reason under the state antitrust statutes to a restrictive covenant in a shopping center lease. *Elida, Inc. v. Harmor Realty Corp., supra.*

Fotomat would have this Court apply the rule of *per se* illegality, which the Supreme Court has developed for conduct that is "manifestly anti-competitive." *Continental T.V., supra,* 433 U.S. at 50, 97 S.Ct. at 2557. Fotomat relies on such cases as *Klor's Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1952), which held that a group boycott, or a concerted refusal by traders to deal with other traders, to be illegal *per se* under § 1 of the Sherman Act. Courts have not extended the group boycott *per se* rule where the concerted refusal is not designed to drive out competition, but is instead designed to achieve some other goal. *Smith v. Pro Football, Inc.,* 593 F.2d 1173, 1180 (U.S.App. D.C.1978); *see also North American Soccer v. National Football League,* 670 F.2d 1249, 1258–9 (2d Cir.1982); *U.S. Trotting Ass'n. v. Chicago Downs Ass'n, Inc.,* 665 F.2d 781, 788 (7th Cir.1981).

There was ample evidence presented at the hearing on this motion to indicate that the purpose of the restrictive covenant was not to exclude Fotomat from competition, but was intended to enhance pedestrian traffic in the Shopping Center and in the Genovese store. Fotomat is free to compete within the Shopping Center as long as it operates an in-line store. The restrictive covenant prevents operation of drive-in photo kiosks only, whether owned by Fotomat or any other drive-in film processing company. The restrictive covenant was not designed to prevent competition with any particular competitor, but only to prevent the perceived adverse effects of drive-in photo operations. The testimony established that Genovese had legitimate business reasons concerning the effects of drive-in photo kiosks, which prompted it to bargain for the restrictive covenant when it negotiated its lease with Bercrose and Copaco. The Court finds that the restrictive covenant is not so plainly anti-competitive to warrant application of the *per se* rule of illegality.

■ The rule of reason analysis applied to most business relationships under the antitrust laws is derived directly from the common law test of the reasonableness of restrictive covenants. *National Society of Professional Engineers, supra,* 435 U.S. at 689, 98 S.Ct. at 1364. One of the most frequently cited statements of the rule of reason is that of Mr. Justice Brandeis in *Chicago Bd. of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918):

> "Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts."

Applying this test to the restrictive covenant contained in the Bercrose-Genovese Lease, the Court finds that it is reasonable and not violative of state or federal antitrust laws.

■ The final requirement for enforcement of a restrictive covenant is actual or constructive notice. The evidence established that Fotomat did not have *actual* notice of the restrictive covenant until September 27, 1982, which was after it had entered into its lease with Copaco, and after the constuction of the kiosk had begun. The inquiry must then turn to whether there were sufficient facts available to Fotomat from the public land records and other sources so that it could be deemed to have had constructive notice of the restrictive covenant.

Genovese had recorded the Memorandum of Lease on the Bloomfield Land Records in compliance with Conn.Gen.Stat. § 47–19, and such recording provides adequate notice of all of the terms contained in the lease itself. The Memorandum of Lease, however, was recorded in the grantor index of the land records under the name of Bercrose only. Fotomat contends that because it leased its property from Copaco, the Memorandum was not in its chain of title and it should not be deemed to have constructive notice of the Memorandum. Nevertheless, the Joint Development Agreement was recorded in both Copaco's and Bercrose's chains of title and it expressly requires the joint consent of both owners of the Shopping Center for any construction in the common parking areas. Fotomat never checked the land records to see if there were any restrictions that would prevent either owner from giving such consent. In fact, Fotomat never bothered to obtain the required written consent of both owners. Fotomat originally planned to place its kiosk on Bercrose's portion of the Shopping Center, but it never checked the land records to see if any restrictions were recorded under Bercrose's chain of title.

The Joint Development Agreement also expressly provides that the separate ownership of the Shopping Center would have no practical effect on the tenants of the Shopping Center. In addition, the commonality of ownership between Bercrose and Copaco, which share the same owners, as well as the same business address and key employees, suggests that Bercrose and Copaco cannot fairly be treated as separate entities. Under these circumstances, the Court finds that Fotomat had a duty to search the land records under both the Copaco and Bercrose chains of title and is deemed to have had constructive notice of the Memorandum of Lease. By virtue of Conn.Gen.Stat. § 47–19, the Court finds that Fotomat had constructive notice of all of the terms and restrictions contained in the Bercrose-Genovese Lease.

■ The Court finds that the plaintiff has sufficiently demonstrated that it has an enforceable restrictive covenant, which was reasonable and of which the defendants had

adequate notice. The plaintiff has also demonstrated that if the restrictive covenant is breached, it will suffer damages in terms of lost sales, which will be impossible to accurately measure. The balance of hardships thus tips decidedly in favor of the plaintiff and issuance of a preliminary injunction would not be inequitable. Accordingly, the plaintiff's motion for preliminary injunction is granted.

### Order

IT IS HEREBY ORDERED THAT:

Until a final hearing and final adjudication of this dispute on its merits, the defendants, Bercrose Associates and The Connecticut Packing Company, Inc., are hereby restrained and enjoined from demising any premises within the Copaco Shopping Center to any drive-in operation or business whose principal business is the receipt and processing of photographic film for development, including, but not limited to, drive-ins known as Fotomat.

IT IS FURTHER ORDERED THAT:

Until a final hearing and final adjudication of this dispute on its merits, the defendant, Fotomat Corporation, is hereby restrained and enjoined from conducting any film processing business from its kiosk currently located in the parking lot of the Copaco Shopping Center.